## STANDARD OIL CO. v. GLOBE OIL & REFINING CO.
### No. 5511.

Circuit Court of Appeals, Seventh Circuit.
March 3, 1936.

Russell Wiles, George A. Chritton, and Charles J. Merriam, all of Chicago, Ill., Bruce K. Brown, of Wenona, Ill., and Edward B. Beale, of Chicago, Ill., for appellant.

Arthur C. Denison, of Cleveland, Ohio, and J. Bernhard Thiess and Thorley Von Holst, both of Chicago, Ill., for appellee.

Before EVANS and SPARKS, Circuit Judges, and BRIGGLE, District Judge.

SPARKS, Circuit Judge.

Appellant charged appellee with infringing claims 2 and 5[1] of United States patent No. 1,392,584 to Lewis and Cooke, and claims 1 and 2 of United States patent No. 1,851,526 to Shaeffer and Brown. Appellee pleaded non-infringement and invalidity. The court held that the claims

---

[1] "2. The improvement in the art of cracking petroleum oils by distillation under pressure which consists in passing the mixture of sufficiently cracked and insufficiently cracked vapors continuously produced within the still through a plurality of separated bodies of petroleum oil arranged in series and maintained at temperatures such as to condense all insufficiently cracked fractions but not to condense the sufficiently cracked fractions, condensing and collecting the sufficiently cracked fractions which escape condensation in the said liquid bodies, and continuously returning to the still the insufficiently cracked fractions condensed by the said liquid bodies."

"5. The improvement in the art of producing gasolene hydrocarbons from relatively heavy hydrocarbons which consists in subjecting such relatively heavy hydrocarbons to distillation under a pressure upward of 4 atmospheres, passing the mixture of sufficiently and insufficiently cracked vapors continuously produced within the still through a succession of liquid bodies of petroleum oil maintained at temperatures to condense all non-gasolenelike hydrocarbons and not to condense the gasolenelike hydrocarbons, separately condensing and collecting the gasolenelike hydrocarbons, and continuously returning the condensed non-gasolenelike hydrocarbons to the still."

in issue were invalid for lack of invention, and that there was **no** infringement of the Shaeffer and Brown patent. It held, however, that there was infringement of the Lewis and Cooke patent, if that patent were valid.

We shall first discuss the Lewis and Cooke patent which was issued October 4, 1921, on an application filed May 7, 1917. This alleged invention relates to the art of distilling petroleum oils and more particularly to a process of distillation conducted under pressure for the purpose of effecting the conversion of heavier or high boiling point oils into lighter or low boiling point oils.

Patentee here claims to have discovered a distillation process which may be accelerated and made to yield superior results both quantitatively and qualitatively if the vapors passing from the still are subjected to the absorbing or direct condensing action of a body or bodies of liquid, as for example in a fractionating column or the like; that by the use of such means there are condensed from the outgoing vapor stream practically all constituents thereof which have not suffered sufficient decomposition, and at the same time the condensing effect is so perfectly controlled that no substantial proportion of the vapors which have suffered sufficient decomposition is condensed. The preferred practice is to connect the inlet end of the fractionating column or its equivalent directly with the still, so that the reflexing condensate may return immediately and continuously to the still. It is also preferred to connect the vapor outlet at the top of the fractionating column or its equivalent, through an open pipe, directly with a water cooled condenser in which the vapors constituting the net result of the process are condensed under the same pressure obtaining in the still and its connecting fractionating column.

The drawing accompanying the specifications illustrates an arrangement of still, fractionating column, and final condenser which is said to be well suited to the practice of the alleged invention. We here present a substantial reproduction of that drawing, omitting the furnace underneath the still, the masonry piers supporting the fractionating column, and the water bath in which the condensing coil is mounted. To this we have added the names of the various elements employed, which do not appear on the original drawing.

BUBBLE TOWER FRACTIONATOR

CONDENSER

VAPOR LINE

REFLUX

RECEIVER

BURTON CRACKING STILL

FIRE

It comprises a horizontal, cylindrical still mounted upon a furnace. The top of the still near the back has tapped therethrough a vapor outlet line, 3, connected with the base of the fractionating column, 4, which is supported on masonry piers. This column is in form a vertical cylinder having arranged in its interior a plurality of pans, 6, each of which is provided with vapor ducts, 7, capped by heads, 8, which are perforated at their side walls near the bottom of the pan. A constant level of liquid is maintained in each pan by means of an overflow pipe, 9, which discharges into the next lower pan. The bottom pan, 6', is spaced some little distance above the lower end of the column, and the overflow pipe, 9', for this pan carries an inverted siphon or trap, 10. The reflux condensate collecting in the bottom of the column is returned to the still by a drain pipe, 11, tapped into the back head of the still and connecting with the still with an inverted siphon, 12, by which the reflux condensate is carried down near the bottom of the still and again brought upwardly and discharged into the upper portion of the still at a point above the average liquid level and not substantially below the highest liquid level therein.

From the upper end of the fractionating column the outgoing vapors are carried through a line 13, to a condensing coil, 14, mounted in a water bath. This coil drains into a receiving drum, 16, provided at the bottom with a liquid draw-off pipe, 17, and at the top with a valved gas-escape and control pipe, 18.

The operation of the apparatus is as follows: A charge of relatively heavy or high boiling hydrocarbon oils, from which it is desired to produce a maximum quantity of relatively low boiling point or light hydrocarbons, is placed in the still and by means of the furnace the contents of the still are raised to the temperature at which distillation begins. In order to prevent the distillation of any part of the contents of the still before the desired operating temperature has been reached, it is of advantage to introduce into the still and condenser system, as for instance through the control pipe, 18, an incondensable and chemically inert gas in sufficient quantities to create a substantial pressure within the apparatus. Thus the liquid body within the still is prevented from distilling over until it has been raised in temperature to the point required to begin the conversion. When that temperature is attained the liquid contents of the still begin to undergo chemical changes by which they are in part converted into lighter and lower boiling point constituents, and such reaction products, accompanied and diluted by a greater or less proportion of vapors which have not been decomposed to the full extent desired, pass out through the vapor line, 3, into the base of the fractionating column, 4. In their passage upward those vapors are fractionally condensed, the condensate serving to fill the pans, 6, and continuously overflowing from each upper pan to the next lower pan and finally into the base of the column, from which the condensate drains through the reflux pipe, 11, back to the still. By reason of the inverted siphon, 12, in the still, the reflux condensate becomes heated to the temperature of the still.

When the pans in the fractionating column become filled with liquid the outgoing vapors are compelled to bubble through the liquid in the pans successively in order to reach the top of the column. The pans and the liquid therein are automatically maintained at progressively decreasing temperatures from the base to the top of the column, and the condensate in each pan is of correspondingly different gravity and boiling point. By reason of the thorough washing and extensive surface contact of the vapors with the several liquid bodies, there is effected an exceedingly accurate fractionation. The column is so proportioned and its condensing capacity is such that the liquid in the lower pan does not at any time contain any appreciable proportion of the low boiling point or light constituents which are to constitute the net result of the process, so also the contents of the top pan will be substantially an oil slightly higher in boiling point than the end fractions of the product which is to constitute the net result of the process. The intermediate pans will contain in varying proportions heavy and light or high boiling point and low boiling point fractions or constituents.

The vapors which escape condensation in the column or which are redistilled from the upper pan pass outwardly through the line, 13, at the top of the column and are condensed in the water cooled condenser, 14, draining therefrom into the receiving drum, 16, from which they are withdrawn at such rate as to maintain a free space above the liquid level in the drum.

The pressure within the apparatus is controlled through the gas control pipe, 18, which serves to vent from the system any excess quantity of incondensable gas formed therein, or to convey into the system incondensable gas from some other source should the production of gas within the system fail at any time to answer the predetermined pressure requirements.

It is claimed that this process is of the greatest technical advantage when applied to the pyrogenesis of gasoline, that is to say, the mixture of aliphatic hydrocarbons mainly of the saturated series, and boiling between 80° and 420° F., from the heavier or higher boiling point constituents of crude petroleum, such as fuel oil, gas oil, and the other relatively heavy products or residues of refinery processes boiling in large part at and above 500° F.

With respect to the question of infringement, the court found that appellee cracks in a pipe still which at the date of the alleged patent was a generally known equivalent for a bulk still; that in its process appellee forces its gas oil stock at a pressure of over 500 pounds through a pipe coil several thousand feet long and heats it to a temperature so high that about twenty-five per cent of the oil is converted into gasoline in its travel; that the mixture of tar, uncracked oil, gasoline and gas is discharged, after mixture with fresh reduced crude oil, into an evaporating chamber at 24 pounds pressure (the addition of the reduced crude oil being an improvement which is not here material).

It was further found that in appellee's evaporation chamber the gasoline, kerosene, and gas oil evaporate, leaving a heavy tar behind; that the vapors then flow through a bubble tower and are rectified as in the patent in suit; that the pressure distillate vapor, which is 85 per cent gasoline, goes to a final condenser, and the runback or reflux, free of gasoline, is drawn from the bottom of the bubble tower and pumped back to the pipe still. Hence, the court found that patentees' process was practiced by appellee. Under the doctrine of equivalents and the well-settled rule that an inventor is entitled to all the uses to which his invention may be put, we think the court's findings in these respects were correct, and they are supported by the greater weight of the evidence.

The court held this patent invalid because it was an aggregation of old elements, a mere double use, which did not produce any new result, and because it was anticipated by prior art patents to Vaughan, No. 49,689, to Barbet, No. 836,732, and to Ellis, No. 1,396,999, which were not cited in the Patent Office against the application of Lewis and Cooke.

As explanatory of appellant's contentions, it may be said that crude oil, with which all refining starts, is an enormously complex mixture of hydrocarbons which differ from each other very widely in their chemical structure and of which there are innumerable varieties. For practical commercial purposes they are divided into separate complex mixtures sold under the trade names of gasoline, kerosene, gas oil, lubricating oil, and the like. The separation is accomplished by distillation, advantage being taken of the fact that the lighter products boil at lower temperatures than the heavier ones. By various types of fractional distillation it is possible to divide the crude oil with the required accuracy into the various commercial products.

When heated above about 700° F., the hydrocarbons decompose. This process is usually called "cracking" and it is caused entirely by heat. It is quite intricate when chemically considered, because the complex hydrocarbons of the original stock break up in various ways into different compounds, and by joining with others may form new compounds. Thus are formed gas and light oils, such as gasoline, intermediate oils like kerosene and gas oil, and finally heavy tar and asphaltic materials. If the cracking is carried far enough the heavy products form insoluble masses known as coke. We accept appellant's statement as true that very little is or can be known of the chemistry of these cracking processes, and that because of their abstruse character, progress therein has been almost wholly empirical.

It is obvious that the alleged invention resides in the combination of admittedly old elements—the cracking still of the Burton patent, No. 1,049,667, and the bubble tower fractionator. Appellant contends, however, that by the combination, the patentees obtained a new and beneficial result. It admits that runbacks, or refluxes, or partial condensers generally were as old as distillation, and in the practice of

that art they had been built of every possible design. Some were of pipe, others were large towers which contained a variety of elements such as stone, tile, baffle plates, cascading pans, sprays, steam jets, and the like, and that until the disclosures of the alleged patent, it seemed to make no important difference what sort of runback was used for oil distillation. It was under these conditions, as appellant contends, that Lewis and Cooke made the discovery disclosed by their patent, that if, instead of the runbacks then common both in cracking and elsewhere in the oil refining art, they used a different old fractionating device known as a bubble tower, they (1) greatly accelerated the chemical synthesis of gasoline, (2) decreased the formation of undesirable gas and coke, (3) reduced the fuel required, and (4) got a better product. Hence, it contends that these functions are new and clearly avoid the secondary rule against patents on mere double uses, leaving only the inquiry as to obviousness which it urges was clearly disproved.

It is clear that appellant's argument is based on the assumption that the patent is of a chemical character, that is to say, that the new results obtained were caused by chemical reaction in the still, due to the character of the reflux returned to the still from the bubble tower. If the patent can be sustained it must be upon this theory.

The District Court, however, found that the results obtained were not due to the chemical reaction in the still but to the old and well known physical action in the bubble tower.

The District Court found that the "cracking" of hydrocarbon oils to make gasoline is a chemical process, and that the mere separation of gasoline, kerosene, gas oil, lubricating oil, and the like, by distillation is not a chemical process; that fractionation is the physical separation of mixed vapors derived from liquids having different boiling points, into two or more fractions by cooling, which is accomplished at least in part, by the contact of vapors from the same still, and that any device by which this is accomplished is a fractionator. The correctness of these findings we think must be conceded.

The following facts as found are supported and not controverted by the evidence: The art of fractionation is very old, and various devices such as rock towers, baffle towers, and bubble towers were used as fractionators in the distillation art long prior to the filing date of this patent. Of all fractionators known in the art prior to 1917, the bubble tower was recognized as the most efficient. It effected the cleanest separation of product and reflux; it had much greater capacity than any other, and the large pools of liquid on the trays acted as a stablizer on whatever operation might be going on in the still. These advantages were well recognized prior to patentees' filing date.

The art of cracking hydrocarbons under pressure to make gasoline in bulk pressure stills, and taking off the vapors and fractionating them into the desired product and into reflux to be returned to the still for further cracking, was also very old prior to 1917. Fractionators such as the pipe of Burton, No. 1,049,667, the runback of Humphreys, No. 1,119,700, the device of Hopkins, No. 1,199,463, the radiator of Moore, No. 1,130,318, and the rock tower and baffle tower were then in common use on cracking stills, and all returned reflux to the still. With respect to each, the degree of efficiency depended on the degree of accuracy of separation of the desired product from the heavier ends which were to be returned as reflux to the still, and in the use of each fractionator it was well recognized that the better the separation, the less heat loss would result from the return of the reflux to the still.

In atmospheric distillation of petroleum the use of the bubble tower as a fractionator had been taught to the art in 1871, by Rogers, patent No. 120,539. Prior to 1917, the act of distillation included the use of a bubble tower as a fractionator in the distillation of alcohol, benzol, petroleum—either in atmospheric or pressure stills—liquid air, ammonia and other products, and its use to procure quantity and quality of product, to obtain greater capacity and accelerated action, and the stabilizing effects of its large pools of liquid were well recognized.

The District Court further found that Lewis and Cooke disclosed merely the substitution on an old bulk pressure cracking still of the equally old bubble tower in lieu of less efficient fractionators, and that the stated objects of their alleged invention, namely, to obtain better quality and quantity of production and accelerated action, were precisely the same advantages which

had always attended the use of the bubble tower in alcohol and other distilling operations; that the bubble tower was adopted commercially in the petroleum industry for atmospheric distillation about the time it was adopted for pressure cracking distillation, the adoption occurring in both cases when, for economic reasons, its cost was felt to be justified.

The court further found that the bubble tower in combination with a cracking still merely operates in accordance with the law of its being; that the results of such use were obvious and to be expected, and were neither new nor unusual; that all the advantages arising from such use were due to better fractionation and to the inherent nature of the bubble tower; and that the difference in efficiency between it and other fractionators was merely in degree and not in kind.

A perusal of the entire record convinces us that these findings are supported by a substantial preponderance of all the evidence, and that the court's conclusions with respect to the invalidity of the Lewis and Cooke patent are sound.

 Of the seven claims of the patent only those in suit, 2 and 5, disclose means of returning reflux to the still. It is obvious, therefore, that the gist of the alleged invention lies entirely in the quality of the reflux from the bubble tower which, it is claimed, exercises a novel effect upon the operation of the still. It is not apparent to us that the reflux from the bubble tower affects the shell cracking still in any different manner, except in degree, than the reflux from any other fractionator. The difference in degree was not only foreseeable and inevitable but it was known and had been taught prior to the application of these patentees. Ellis patent No. 1,396,999. We are not unmindful that an operative change and a new use may be patentable, although the changes be only in degree and not in kind, but this is only true in cases where the new function is not clearly obvious. It is argued by appellant that the alleged new use of this patent was entirely unobvious because (1) there was no apparent need for the usual function of a bubble tower, that is to say, clean fractionation was not necessary, (2) the bubble tower was more expensive, and (3) it was more dangerous. The facts stated in these reasons are unquestionably true, but it does not follow from this that the alleged new use was not obvious. Invention will not be inferred from the mere

fact that on account of danger or economic reasons there was delay in resorting to a tool of the industry. See Firestone Tire & Rubber Co. v. United States Rubber Co. (C.C.A.) 79 F.(2d) 948.

Aside from the cost and inherent danger of the bubble tower, the record discloses that when profits were large, as formerly, the refiners were not interested in developing the highest degree of efficiency and equipment with their attendant cost and danger, because it was thought to be more profitable to invest the excess cost of the bubble tower in additional cracking equipment for the production of more gasoline. When the price of gasoline had fallen considerably, the necessity of devoting more attention to efficiency of operation and saving of loss became more apparent, and this economy could be accomplished through the use of the bubble tower which was well known to be the best fractionator.

Although the use of the bubble tower in atmospheric distillation of petroleum was suggested as early as 1871, by Rogers, patent No. 120,539, yet it was never used in that branch of the industry until about the same time that it was adopted for cracking stills, and the resultant improvements obtained in each were substantially the same. These facts were well and generally known by those interested, but notwithstanding this fact, the bubble tower was not adopted for cracking stills in appellant's plant at Whiting until the year 1918, or for atmospheric stills until 1919 or 1920. Moreover, after appellant's installation of the bubble towers on the Burton shell stills in 1919, they were abandoned following a disastrous fire. After that, appellant did not build another Lewis and Cooke bulk pressure still and bubble tower, and during the same period the operation of the shell stills equipped with Moore radiators increased substantially.

The specific advantages which appellant claims for the patent are (1) the stabilizing effect of the bubble tower upon the action of the still where the cracking occurs, (2) the accelerated action of the still, (3) fuel economy, (4) diminution of the coke residuum per gallon of gasoline, (5) increased yield of gasoline per barrel of stock.

The stabilization of the distillatory process is admittedly due to the large pools of liquid in the decks or pans of the bubble tower, and that feature was not present in any other fractionator. However, that

advantage did not arise for the first time when a bubble tower was installed on a cracking still, nor was it a result of the combination. It was a foreseeable and obvious advantage of the bubble tower in whatever environment it might be placed, just as the stabilizing effect of the fly wheel was said to be the foreseeable and inevitable result of its use on the sound recording mechanism in Altoona Public Theatres, Inc., v. American Tri-Ergon Corp., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005.

It is obvious that the claimed advantages of accelerated action of the still, and fuel economy and increased yield of gasoline per barrel of stock are the direct results of better fractionation and are not in any material manner caused by the combination. The same may be said with respect to the dimunition of coke residuum per gallon of gasoline. The finished product being excluded from the reflux, it would follow, at least theoretically, that more gasoline would be obtained for a given coke production, but the record gives us no assurance that the advantage in this respect would be appreciable. The theory that the return of gasoline from improper fractionation would result in coke formation is based upon the premise that gasoline returned in the reflux would be cracked. However, appellant's expert said the amount of gasoline in the Burton runback which would thus be decomposed or cracked would be quite small because of the low temperature of operation.

Another of appellant's experts, who had been appellant's chief chemist in the Whiting plant since 1914, and who was closely associated with Cooke in the experimental use of the bubble tower gave it as his opinion that a comparison of the results of the alleged patent and the radiator still disclosed a much better quality of distillate in favor of the former, and that it was attributable to better fractionation; that this was the important difference, and that he recalled no other differences. The character of this witness and his obvious qualification to speak authoritatively in the realm of chemistry convince us that if there had been different results obtained by chemical reaction of the reflux upon the contents of the still, he would have remembered it.

The file wrapper is not assuring in appellant's behalf. The original application contained the claims now in suit. It was rejected by the Examiner as disclosing an ordinary fractionating condenser combined with a cracking process such as Hopkins, No. 1,199,463. After amendment it was again rejected as a mere substitution of a column such as Frasch, Nos. 487,-119; 490,144; 845,456; or Kreusler, No. 50,368, in the general organization of Hopkins. It was again amended and supported by the affidavit of E. J. Schaeffer, which averred (1) that the bubble tower produced more than twice as much gasoline per hour than did the still with any other fractionator, (2) that there was a peculiar and unexplained difference in the character of the distillate produced in a still equipped with a bubble tower and one equipped with a Moore radiator, (3) that the distillate of the bubble tower was better in quality than that of Moore, because it was more easily brought to color, and (4) that in aid of the color treatment of the pressure distillate of the bubble tower, patentees' clay filtration method was advantageous. It is sufficient to say that the clay filtration method referred to was never practiced commercially by appellant or anyone else, and the other averments of advantage are either not supported by the record, or are based on tests which were hardly fair to other fractionators.

The Examiners again rejected the claims, and upon appeal to the Board of Examiners-in-Chief the decision of the Examiner was reversed without citation or consideration of the prior art upon which the District Court based its findings and conclusions. We think the District Court was right in holding the claims invalid for lack of invention.

*Shaeffer and Brown Patent No. 1,851,526*

This alleged invention relates to improvements in the production of low boiling point hydrocarbon oils from higher boiling point hydrocarbon oils by pyrolitic decomposition. Claims 1 and 2 [2] were held not infringed and invalid.

---

[2] "1. The method of producing low boiling hydrocarbon oils from higher boiling hydrocarbon oils which comprises forcing such oil in a rapid stream through a heating zone maintained at such a temperature as to bring the oil to cracking temperature, immediately passing the oil into and through a confined passage subjected to moderate heat sufficient only to maintain the oil at substantially the same cracking temperature, the rate of flow of the oil being sufficient to prevent sub-

The drawing accompanying the specifications is here set forth:

In carrying out this process the heavy hydrocarbon oil of the nature of gas oil or a crude residuum is drawn from pipe 49 and forced by the pump, 50, into the line, 51, to the heat exchanger, 30. From this the stock partly heated therein passes through line, 52, to the preheating coil, 6, in which it is preheated to a temperature below cracking temperature by combustion of gases which have previously been used to heat the primary heating coil, 7, and the digester coil, 10. From 6, the oil, suitably heated therein to a temperature of from 500° to 600° F., is forced through pipe, 8, into coil, 7, in which it is brought to a cracking temperature from 850° to 900° F., while flowing therethrough with such velocity that substantially no deposit of carbon can occur within the coil. From 7 the hot oil passes through pipe, 12, into the digesting coil, 10, where it is held at substantially the same temperature as in 7, by any suitable means, a relatively moderate heat being required for that purpose. The oil is caused to travel through 10 at such a velocity that substantially no deposit of carbon can occur, and the oil is maintained therein for a sufficient period for a substantial amount of cracking to take place.

The digesting coil preferably has a somewhat larger cross sectional area than coil 7, and is somewhat longer, thus providing more capacity and a longer travel stantial deposition of coke or carbon, maintaining a pressure upon the oil sufficient to retain the oil in substantially liquid state until a material amount of decomposition has been effected, introducing the oil products entirely and directly into a chamber at lower pressure, maintaining a liquid body of oil products in said chamber, the point of introduction of heated oil thereinto being below the level of the liquid body, and separating the vapors evolved in said chamber.

"2. The method of producing low boiling point hydrocarbon oils from higher boiling point hydrocarbon oils which comprises passing the oil to be treated in a confined stream through a heating zone at a temperature sufficient to bring the oil to cracking temperature, then passing the oil in a confined stream through a zone heated sufficiently to maintain the oil at substantially the same cracking temperature, maintaining pressure upon the oil sufficient to keep the original stock in liquid state under the temperature conditions prevailing, the velocity of the oil in passing through said heated zones being such as to prevent substantial deposition of carbon therein, introducing the heated oil products entirely and directly into a body of liquid cracked oil products maintained at a lower pressure above atmospheric pressure, whereby a separation of vapors is effected and carbon formed is maintained in suspension in the liquid residuum in said chamber, and withdrawing liquid residuum from said chamber."

than 7. Suitable dimensions for heating and digesting coils in a plant capacity of 60 barrels per hour are respectively 4,500 feet of three-inch pipe and 6,000 feet of four-inch pipe. These dimensions may be varied within wide limits.

From coil 10 the oil passes through line 13, which has a gas cushion, 14, for suitably cushioning hydraulic shocks, and after passing pressure relief valve 16, enters the vaporizing drum, 15. Valve 16 is so adjusted as to maintain in the heating and digesting coils such pressure as to maintain the stock in substantially liquid state until a material amount of conversion has occurred. For this purpose a pressure of 200 to 600 pounds per square inch may be employed. With stocks of the character of gas oil a suitable pressure of 325 pounds per square inch is suggested. In the vaporizing drum, 15, a pressure above atmospheric is maintained, suitably 25 pounds or higher per square inch. A body of liquid is maintained in the drum, and, by the incoming hot oil, it is kept at a temperature of from 100° to 200° below that prevailing at the outlet of coil 10. Pipe 13 ends in the drum in a distributing pipe, 17, near the bottom and well below the surface of the liquid body in the drum. The release of pressure upon the liquid entering the drum causes a rapid vaporization of from 40 to 80 percent, and the velocity of the oil thus entering the drum causes a violent agitation of the liquid body which, in turn, causes any coke formed in the oil body to be kept in suspension, thus preventing coke deposits in the drum.

The vapors from the drum pass through a separator, 19, where entrained liquid is removed and returned to the drum. The vapors pass through line 20 into the tower, 21, where they are slightly cooled, partly by radiation from the tower and partly by introduction into the tower of a suitable cooling medium, preferably hydrocarbon oil such as part of the stock to be treated.

The patent discloses a continuous cyclic system, and a stream of fresh feed discharges into the reflux line, 52. Many details of fractionating and heat exchange equipment are shown which are not material to the question before us. The elements here pertinent are the heating and digester coils, the gas cushion, 14, the vaporizing chamber, 15, with its float indicator, 18, and perforated pipe, 17, and the vaporizing chamber from the top of which are drawn the vapors, and from the bottom the liquid residue.

The court found that in the oil cracking process the limits of time, temperature, and pressure were vital, and that the patent was invalid because in those respects the disclosures were too vague and indefinite.

■ It is axiomatic that a patent must fix the limit of its monopoly with such definiteness that those skilled in the art may readily interpret and practice it. In The Incandescent Lamp Patent (Consolidated Electric Light Co. v. McKeesport Light Co.), 159 U.S. 465, 16 S.Ct. 75, 78, 40 L. Ed. 221, the Court said:

"It is required by Rev.St. § 4888 [35 U.S.C.A. § 33], that the application shall contain 'a written description of the device, and of the manner and process of making, constructing, compounding, and using it in such full, clear, concise, and exact terms as to enable any person, skilled in the art or science to which it appertains or with which it is most nearly connected, to make, construct, compound, and use the same.' The object of this is to apprise the public of what the patentee claims as his own, the courts of what they are called upon to construe, and competing manufacturers and dealers of exactly what they are bound to avoid. Grant v. Raymond, 6 Pet. 218, 247 [8 L.Ed. 376]. If the description be so vague and uncertain that no one can tell, except by independent experiments, how to construct the patented device, the patent is void."

See, also, Merrill v. Yeomans, 94 U.S. 568, 569, 24 L.Ed. 235, and Permutit Co. v. Graver Corporation, 284 U.S. 52, 52 S. Ct. 53, 76 L.Ed. 163.

■ In the interpretation of the limits of patent claims it is proper to consider the specifications, for at times vague and general language in the claims may be interpreted and sufficiently limited by the specification, but vague and general language in the specification is limited by the claims. The limitations, however, must always be fixed somewhere within the degree of definiteness hereinbefore mentioned.

The specification here discloses a temperature in the digesting coil where the cracking occurs of not less than 675°, say 850° to 900° F. It is conceded that the rate of cracking doubles with every 20° rise above the minimum cracking point. This would mean that a rate of cracking at 900° would be five times as fast as at 850°, which would furnish an uncertain experimental range of 500 per cent.

The specification further describes a pressure in the coils varying from 200 to 600 pounds per square inch, and in the vaporizing drum of from 25 to 600 pounds, while the drop in temperature between the coils and drum may be of from 100° to 200°. The claims add no light to the indefiniteness. They call for a cracking temperature, and that is sufficiently definite, but the rate of flow of the oil, it seems to us, is surrounded with unreasonable uncertainty. The claims state that the flow shall be sufficiently fast to prevent substantial deposits of coke or carbon. The specification states that it shall be sufficiently high to prevent the deposit of coke. The record does not disclose how the rate of flow can be determined even by one skilled in the art, without a series of experiments to ascertain when the deposit of carbon will be prevented as the rate of flow increases. It is true that the specification states that certain lengths and sizes of pipe constituting the two zones will be appropriate for a plant having a capacity of 60 barrels an hour. Of course, from that data the rate of flow through those particular pipes is computable, but that computation certainly would not constitute the full disclosure which the law requires. A speed much slower than this computation might prevent a carbon deposit, and if so, that fact alone would not be sufficient for anyone to say that such operation was an infringement of this patent.

The claim further calls for a pressure sufficient to keep the oil in a substantially liquid state until a material amount of decomposition has been effected, but neither the claims nor the specification give us any information as to what is a "substantially liquid state" or how much "decomposition" is material.

It is contended, however, by appellant that the claims should be liberally construed. However, as this patent never went into commercial use, even by appellant, it must be strictly construed as a mere paper patent. Deering v. Winona Harvester Works, 155 U.S. 286, 15 S.Ct. 118, 39 L.Ed. 153; National Malleable Castings Co. v. Buckeye Malleable Iron & Coupler Co. (C.C.A.) 171 F. 847. We think the court was right in holding the claims invalid for vagueness.

The court further found that the patent comprised merely an aggregation of seven old steps wherein each step functioned in the combination as it did in the prior art. These steps in the art of cracking hydrocarbons as referred to by the findings are (1) to heat them in tubes rapidly to a high temperature, followed by a decidedly lower rate of heating; (2) to use velocity to prevent deposits of carbon in the cracking coils; (3) to provide cracking processes in which it was claimed that carbon would not collect in the system; (4) to feed the cracked material into the bottom of a tank containing the body of liquid in order to avoid deposits of carbon in the tank; (5) to separate vapor from residuum and withdraw carbon containing residuum from the vapor separator; (6) to return reflux to the cracking tubes; and (7) to operate a cracking system continuously instead of a batch process.

Appellant describes the steps in somewhat different language, but without appreciable difference in effect. They are as follows: (1) Heating the oil in the heating coil, 7, to cracking temperature; (2) passing it through the digesting coil, 10, at the same temperature; (3) maintaining the pressure so high that some conversion must occur before the stock can vaporize; (4) maintaining the high velocity which prevents coking in both coils; (5) dropping the pressure; (6) feeding to the evaporator, 15, below the liquid level therein to provide the desired agitation; and (7) withdrawing the residuum from the evaporator.

All of these features, except withdrawing the residuum from the evaporator, are found in Link, No. 1,756,563, and separately, including the withdrawal of residuum, they are found in other prior art patents referred to in the record. It is worthy of note that Link was not a file wrapper reference against this patent.

It is contended by appellant, however, that the operation of the Link patent is entirely different from that of the patent in suit, in that Link has a drum from which no liquid is ever withdrawn, and that his object is to turn all the oil into coke and then stop the operation and clean out the receptacle. But Link discloses an alternative operation other than running to coke. He states that if it is not desired to run coke in still 1, the discharge from the cracking still "may be run off through line 49 to another still for the coking of the residuum." It is obvious that the withdrawal of the liquid residuum could be effected just as well from still 1 as through

line 49, if the intention is to perform the coking operation in another still. Certainly, in that event, the change in location of the old and well known residuum draw-off would not rise to the dignity of invention. In any event, Link fully anticipates claim 1, for that claim does not disclose a residuum outlet. It is urged, however, by appellant that the omission of that feature from claim 1 was due to inadvertence and that it should be supplied by inference as an obvious expedient of that art. Indeed, appellant's expert said that without it the process would become totally inoperative. This may be conceded, but it only proves that there can be no invention in claim 2 over claim 1, or over the Link patent, merely because claim 2 specifies the old expedient which is to be inferred in claim 1.

It is further contended by appellant that Link does not disclose the Shaeffer and Brown heating method; that he has no pressure on his cooperating drum; and that he does not disclose the velocity of flow for the purpose of preventing carbon deposits in the coil. We think the record quite clearly shows otherwise.

Claim 1 also discloses the maintenance of a pressure upon the oil sufficient to retain the oil in a substantially liquid state until a material amount of decomposition has been effected. It is true that Link does not definitely disclose whether the cracking is conducted in liquid phase, but if the patent in suit is to be read upon appellee's operation, in which the contents of the coil are over 85 per cent vapor, then the Link operation would clearly anticipate this step of the patent.

It is said by appellant that in a patent case involving the correlation of so many elements as in Shaeffer and Brown, it would seem futile to argue lack of invention merely because the elements were separately found in so many different patents. Indeed, it says that no case decided against a patent is recalled where so many references were required to produce the process challenged. We do not conceive this to be the criterion by which the validity of a patent for a combination of old elements is determined. Regardless of the multiplicity of references in such cases, the validity must depend upon a new resulting use, or an operative change in degree which was not theretofore obvious to one skilled in the art. A perusal of the record convinces us that the District Court was right in holding that this patent produced no new or unobvious result, and that it was a mere aggregation of old elements. We are further in accord with the finding that the patent was anticipated by Link except as to the residue withdrawal feature disclosed in claim 2, and that, for reasons heretofore stated, we do not deem invention.

The file wrapper discloses that original claims 1 and 2 were rejected on Hanna patent, No. 1,449,226, and on Black patent No. 1,426,813. These claims are identical with the claims in suit except that in the latter the words "entirely and directly" are inserted, and excepting two minor substitutions which are not here important. The words "entirely and directly" were inserted to distinguish it from the Black patent in which the oil from the furnace is passed through a heat exchange wherein it is cooled before entering the vaporizing chamber. The Examiner held that the insertion successfully overcame the grounds of his rejection of the original claims, and the claims thus amended were allowed. But the difficulty lies in the fact that as amended both claims are anticipated by Link, which was not a file wrapper reference.

The District Court further found that appellee's device did not infringe this patent. It is the same device as that charged with infringement of the Lewis and Cooke patent. On account of our conclusion that the patent is invalid it is unnecessary to prolong this opinion with a discussion of that issue. We merely set forth in the margin the court's conclusions on that issue.[3] It is sufficient to say that a study of the record leaves no doubt in our minds as to their soundness.

Decree affirmed.

---

3 "4. The defendant does not infringe the claims in suit of the Shaeffer & Brown Patent because defendant does not have the two zones, the heating zone and the digesting zone of said patent.

"5. The defendant does not infringe the Shaeffer & Brown Patent because the claims in suit of said patent are limited to a liquid phase operation in the cracking coil, whereas the hydrocarbons in defendant's cracking coil are 85% vaporized.

"6. The defendant does not infringe the claims in suit of the Shaeffer & Brown Patent because defendant does not maintain in the vaporizing chamber a liquid body of oil, nor does it introduce the hydrocarbons from the cracking coil below the level of such a body."