JOHNSON LABORATORIES, Inc., v.
MEISSNER MFG. CO., and three
other cases.
Nos. 6023, 6136–6138.

Circuit Court of Appeals, Seventh Circuit.
Aug. 1, 1938.

Rehearing Denied Oct. 3, 1938.

---

938

Wm. H. Taylor, Jr., Harry C. Hart, of New York City, and W. H. F. Millar, of Chicago, Ill., for Johnson Laboratories, Inc.

George L. Wilkinson and Howard W. Hodgkins, both of Chicago, Ill., for Meissner Mfg. Co.

Before MAJOR and TREANOR, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

The Johnson Laboratories, Inc., brought suit against the Meissner Manufacturing Company, for infringement of Claim 38 of Polydoroff Patent No. 1,982,690 and Claim 5 of Crossley et al., Patent No. 1,978,568, both assigned to Johnson. The court held invalid Claim 5 of the Crossley patent and valid and infringed Claim 38 of Polydoroff. Each party appealed from that part of the decree against it. The Ferrocart Corporation of America brought suit for a declaratory judgment under Section 274d of the Judicial Code, 28 U.S.C.A. § 400, to determine the questions of validity and infringement of seven of Johnson's patents, including those involved in the first suit, and charged unfair competition by Johnson Laboratories, Inc., and Aladdin Industries, Inc. The two defendants thereupon filed their counterclaim against Ferrocart for infringement of four patents and for unfair competition. Ferrocart appeals from a decree declaring valid and infringed Polydoroff Patent No. 1,982,690, involved in the

first mentioned suit, and holding that it had unfairly competed with Johnson and Aladdin. The latter appeal from that portion of the decree holding Crossley et al., Patent No. 1,978,568 included in the first mentioned suit, and Polydoroff Patent No. 1,982,689 invalid and decreeing that the two defendants had unfairly competed with Ferrocart.

Ferrocart maintains its office in New York and is a corporation of that state. It imports merchandise from Germany and exploits certain inventions in the radio art and sells to Meissner Manufacturing Company certain cores for use in high-frequency inductance devices. These two corporations were represented in the two suits by the same counsel and their interests are identical. The same is true of Johnson and Aladdin. The various appeals were argued as one and this opinion will dispose of the issues in each. It will be observed that two of the patents are involved in each of the two suits and that the decree of the court was the same with regard thereto in each cause, the first Polydoroff patent being held valid and infringed and the Crossley patent invalid. The only other patent now involved is the second Polydoroff, which, in the second suit, was held invalid.

Polydoroff Patent No. 1,982,690, was applied for August 26, 1929, and issued on divisional application December 19, 1933. Claim 38 only is involved. It covers "a high-frequency inductance device for use in resonant circuits, including at least one low-loss winding and a compressed comminuted magnetic core having insulated particles small enough to pass through a screen having 300 meshes to the inch, the increase in the effective inductance of said winding due to said core being substantially greater than the increase in the effective resistance of said winding due to said core." Such a device, as known to the electrical world, is, in ordinary language, one consisting of a number of turns of wire, whereby the resulting coil possesses the property of electrical inductance. If it is wound upon a non-magnetic core, it is commonly known as an "air-core inductance"; if upon a magnetic core, of iron or other metal, as a "magnetic core inductance." A resonant selective radio circuit, in which the patentee said his device was useful, is one tuned to distinguish between broadcasting stations with various adjacent frequencies. By the tuning, the receiver may obtain reception at one frequency and exclude broadcasters transmitting on adjacent but different frequencies.

The difficulty encountered by many workers in the art of such devices arose largely from the fact that all magnetic core devices inherently possess a quality not desirable in such a circuit, namely: electrical resistance,—inducing losses and tending to destroy selectivity of tuning. In practice, therefore, an inductance device adapted to the frequencies encountered in radio broadcasting will not work satisfactorily if the resistance quality is so great as to defeat the purpose. In other words, the ratio of inductance to resistance must be a useful practical one,—the inductance comparatively large and the resistance proportionately small. It had long been recognized that a magnetic core in a coil serves to increase the inductance but, due to the fact that so-called eddy currents circulate within the core and absorb energy, it likewise increases the resistance, and it seems to have been largely accepted that the additional resistance due to the use of a magnetic core increases rapidly with increased frequency, though the increased inductance due to such a core is substantially independent of frequency. Consequently many in the art believed that such a magnetic core, which improves inductance at low frequency, will improve it to a lesser degree at a higher frequency and, if the frequency be increased sufficiently, becomes positively harmful. The problem, then, of makers of such devices, to be placed in radio receiving sets, was to produce, under the frequencies controlling in broadcasting, the highest possible practical inductance and the lowest possible interfering resistance.

It is insisted that Polydoroff was the first to solve the problem and in so doing achieved invention. His claim is limited first of all to a "high frequency" inductance device to be used in "resonant circuits." He provides in his combination, first, a low-loss winding coil; second, a compressed comminuted magnetic core having insulated particles, and, finally, the requirement that the particles shall pass through a screen having 300 meshes to the inch. This combination, he said, brought about an increase in the effective inductance of the coil winding, due to the magnetic core, substantially greater than the corresponding increase in the effective resistance of the winding, due to the core. He recognized that successful attempts had been made to employ magnetic cores but asserted that the losses from

increased resistance arising in their utilization had made impractical their use in high frequency radio transformers. He said that by using powdered-iron cores it was possible to decrease the size of the windings and thereby minimize the size of the transformers, thus saving cost of space. He asserted that for the most satisfactory results "for frequencies between 1500 k. c. and 1000 k. c." i. e., between 1,500,000 and 1,000,000 cycles, the builder should use iron "reduced by hydrogen," consisting of particles which would fall freely through a screen of 300 meshes to the square inch. He recognized that coarser particles might be used for frequencies below 1,000 k. c. He stated that the fineness of the particles and, to some extent, the degree of compression determined the resistance of the coil and core combination.

It was well known prior to Polydoroff that losses in a ferromagnetic or iron core could be reduced by subdivision of the material into thin sheets. But Johnson insists that this prior use was confined to "low frequencies" namely: those of from 20 to 60 cycles. It was well known also that comminuting or powdering the core material, producing still greater subdivision of material, which could be compressed, or molded into proper form with or without insulation, to form a compacted mass, was similarly useful but, again Johnson says, only for low frequency inductance devices. Such cores had been used for many years for telephone coils, but it is claimed that Polydoroff was the first to use them in combination with a low-loss coil to bring about an efficient device for use in resonant circuits at "high-frequencies." Many writers had previously taught that magnetic cores were improper at high frequencies; and it is insisted that it was novel for him to combine a comminuted core and a low-loss coil in a device efficient and practical in a resonant high frequency circuit.

Unfortunately the term "high frequency" has no settled, definite meaning. Its connotation is relative in character, and there is nothing in Polydoroff's patent to disclose what he intended thereby except his reference to 550 k.c. as an example of lower frequencies. Where he thought "low-frequency" ended and "high-frequency" began is not clear. In the Crossley patent in suit the patentee described 550 k.c. as being within upper high frequency circuits. Johnson offered evidence of one authority to the effect that high radio frequencies include those from 100,000 to 1,000,000 cycles. This divergency is even wider if we heed other authorities. Ferrocart's devices operated at 456 k.c. In Hazeltine Corporation v. Radio Corporation of America, D.C., 52 F.2d 504, the court approved a division between high and low frequencies at the point of 20,000 cycles or 20 k.c., holding those below that point low frequencies and those above high frequencies. It becomes necessary, therefore, to determine whether the prior art discloses or suggests the use of such cores with particles of the suggested size at any frequency within contemplation by Polydoroff when he made his application.

Before examining the specific frequencies at which prior art workers performed their acts, however, it should be observed that it was well known that as the frequency of the circuit increases the size of the particles used in the magnetic core must be reduced to maintain the same efficiency in the core and coil combination. The higher the frequency the finer the particles should be. This was taught by Speed and Elmen in 1921, and appears in various references of the prior art. Indeed, Polydoroff himself stated that coarser particles of magnetic material in the core could be used for frequencies below 1,000 k.c., that is, particles coarser than those passing through a 300 mesh screen.

Stone's No. 767,977, in 1904, in discussing cores used by him in a device for wireless telegraphy, said that they might be made of finely-divided soft iron. He suggested the use of finely-comminuted paramagnetic material, embedded in a dielectric matrix, used as a means to enhance the inductance of a coil without introducing the effects of variable permeability or hysteresis losses.

MacKnight, in 1924, received a patent upon application made May 26, 1922, in which he stated that his object was to provide a core which would reduce to a minimum losses of electrical energy due to eddy-current and hysteresis and still permit the desired density of magnetic flux to be obtained. He said that he contemplated broadly constructing the cores for all descriptions of electro-magnetic apparatus from finely divided insulated particles of iron and specifically included radio apparatus, thus apparently including devices for use in high frequencies, in resonant circuits. He commented that the higher the frequency of the current passing through the core, the finer should be the particles and said that he elim-

inated hysteresis by such cores. He suggested that the material might be suspended in a mobile insulating fluid but that the desired results might be accomplished by surrounding the iron particles with plastic or even solid insulation. He insisted that by employing particles ½₂₀₀₀ of an inch in diameter and such as were not materially greater than ¹⁄₁₀₀₀ of an inch in diameter he effected a marked saving in eddy-current losses in an apparatus employing high-frequency current. ½₂₀₀₀ of an inch is 12.70 microns; ¹⁄₁₀₀₀ of an inch, 25.4 microns. Particles falling freely through a 300 mesh screen are 45 microns in diameter. He insisted that by his method he was able to use magnetic cores in apparatus where such cores previously had been impractical because of the great losses. It may be that MacKnight was not correct in some of his statements regarding the art but he clearly taught the thoughts we have referred to. Such affirmative teaching is applicable prior art.

Hochheim procured three patents: United States No. 1,840,286, issued January 5, 1932, upon application filed August 13, 1926; British No. 269,770 and German No. 473,-480. They are in substantial accord in disclosure. In his American patent, Hochheim said that he had found it of great advantage to make metallic cores for transformers, which are to be operated with rapid and slow oscillations of current, of particles of iron extremely finely subdivided. This powder, he suggested, might be fixed with a small amount of binding or adhesive insulation substance before being molded into the desired form, and he made the assertion that cores thus prepared were superior to those prepared in a similar manner from metal previously marketed, resulting in small eddy-current losses. He prescribed their use in wireless telegraphy or any apparatus working at both slow and rapid oscillation. He said that the hysteresis losses were small and that the cores were especially suitable for use with various "rapid oscillations." He suggested particles generally the size of 0.001 millimetre but said that particles even of .00001 millimetre might be used. This is a range between a diameter of 1 and one of .01 microns. The fair construction of his specifications is the suggestion of use in the high frequency field.

In 1919 Fleming published a book describing a radio receiving set with transformers connecting a plurality of tubes and embracing comminuted iron cores. By this device were received signals forwarded by transmitters on a ship on a wave length of 600 meters or 500 k.c.,—500,000 cycles. Apparently this is within anyone's understanding of a high frequency inductance device, and, clearly, the circuit was a resonant one.

Polydoroff prescribed particles small enough to pass through a screen having 300 meshes to the inch. Translated this means 45 microns in diameter. Obviously smaller particles would pass, but, as Johnson's expert stated, the excellence of the core material is to be determined not by the smallest particle it contains but by the largest. It is the surface and volume of the large particles which "play the most important part," and Polydoroff in prescribing particles which fall through a screen having 300 meshes to the square inch was providing for large particles, having considerable influence upon the performance of the core material. A comparison of other products shows that Speed and Elmen in their article prescribed for two materials an 80 mesh screen and for grade "C" a 200 mesh, through which could pass particles as large as 73 microns in diameter. Hoerning prescribed 250 meshes to the square inch, permitting passage of particles with a diameter of 60 microns. MacKnight prescribed particles 12.5 microns in diameter at 100 k.c. and smaller ones with increasing frequency. Felten, in his British patent, prescribed particles of 10 microns diameter at a frequency of 1,000 k.c. Polydoroff prescribed 300 meshes to the square inch, which would permit the passage of particles 45 microns in diameter. Polydoroff in another patent in suit prescribed 400 meshes to the square inch, permitting the passage of particles 35 microns in diameter. The alleged infringing device uses particles from 1 to 5 microns in diameter; the German Patent No. 459,557 about 1 micron; Ehler, 1 micron and Hochheim about 1 micron. The prior art had taught that the inductance increase caused by an iron dust core is greater proportionately than the resistance increase similarly caused. This was characteristic of the use of low-loss winding and of the specified core with particles small enough to pass through 300 meshes to the inch.

It seems to us that the prior art is such that the prescription of one specified sized particle could not constitute invention. The art was replete with various specifications and the skilled operator in his experiments had his choice of the size which he deemed best suited to his purpose, increasing the fineness as the frequency increased.

■ If this was not the exercise of mechanical skill but amounted to invention, then the claim must be held to the restricted limitation of 300 meshes to a square inch. This was not employed by defendant. Hence there was no infringement.

It was essential in any such inductance device that Polydoroff combine with his core, a winding of wire. The method of winding, the qualities resulting from the various methods used, the function resulting from any one of many forms of winding were well known and Polydoroff had the choice of any of the full range. He could have used a low-loss winding, a high-loss winding or an intermediate-loss winding, but, acquainted as he was with the exigencies of the utilization of his device, he was bound to know that a low-loss winding was essential to successful utility of such a combination as he suggested. Thus, plaintiff's expert witness testified that Polydoroff was concerned with building inductances which were "good," which were "highly efficient" and that one of the things which he knew was that he should start with a low-loss winding, so that he would not be handicapped by losses resulting from the winding, which obviously would not be reduced by the use of the magnetic core. Following this, counsel specifically inquired of the witness if it was not true that in starting with a low-loss winding for the purpose he had in view the patentee was doing that which any expert in the art would know enough to do. The reply was in the affirmative. Still later the witness testified that in the drawings of the patent, the winding illustration might easily be construed as a low-loss winding and that in the status of the radio art in 1929 it would be so construed. He mentioned various known forms as coming within the category of low-loss winding, and said that there was no reason why the patentee should go into that because it had been the subject of discussion and of published articles for many years and "there was much information upon it." So, it seems to us that when in his particular device Polydoroff selected a low-loss winding of the coil, he made the choice that would have been made by anyone skilled in the art. Invention did not lie in the prescription of an element obvious to one adept in the work to be done.

■ From pertinent references in the prior art it appears that the desirability of the use of magnetic cores made of comminuted particles had been taught by various delvers in the art; that it had been established that the higher the frequency the finer should be the particles; that various delvers had prescribed particles varyng in size proportionately from one to fifty, depending upon the desired use; that Polydoroff himself recognized that for lower frequencies coarser particles should be used. We conclude that there was nothing novel in his suggestion of the use of the comminuted particle magnetic iron core or in the suggested size of the particles. It may be that other explorers had not appreciated the full possibilities of the iron core. It may be that what had been known to some was wholly unknown to others, to whom the plaintiff wrote inquiring as to the use of iron cores. But the affirmative evidence is that the possibilities of iron cores in both low and high frequency circuits had been largely appreciated and that Polydoroff had a great sufficiency of teaching. Negative evidence of lack of knowledge of a fact cannot prevail over affirmative evidence of existence of the fact. We believe the letters of third persons were not admissible. If we are wrong in this belief, they carry no weight against affirmative evidence.

■ Nor can the statements made by Meissner or its privy in the Vogt application create an estoppel against Meissner to deny validity. Thus the Supreme Court in Haughey v. Lee, 151 U.S. 282, 14 S.Ct. 331, 332, 38 L.Ed. 162, said: "Whether or not there is any inconsistency in trying at one time to get a patent for a supposed invention, and in afterwards alleging, as against a rival successful in obtaining a patent, that there is no novelty in the invention, it certainly cannot be said to constitute an estoppel. Besides, the defense of want of patentable invention in a patent operates, not merely to exonerate the defendant, but to relieve the public from an asserted monopoly, and the court cannot be prevented from so declaring by the fact that the defendant had ineffectually sought to secure the monopoly for himself." See, also, Paramount Publix Corporation v. American Tri-Ergon Corp., 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997; Standard Water Systems Co. v. Griscom-Russell Co., 3 Cir., 278 F. 703. The cases cited by Johnson do not militate against the soundness of this conclusion.

The Crossley-Neighbors patent was applied for April 9, 1934 and issued August 30, 1934. It relates to a coil and core combination in which the core is magnetic. Claim 5 relied upon is as follows: "5. A high-fre-

quency inductance device including a pancake winding having at least as many layers as turns per layer, and a tubular cooperating iron-containing core, said winding being mounted upon and concentric with said core, the thickness of the wall of said core, the external diameter and length of said core and the length and radial depth of said winding varying by not more than 25% from proportionality to the numbers twelve, forty, forty-six, fifteen and twenty-six respectively." The important thing in the claim is the relation between the winding and the core.

The core was not novel. Polydoroff in his patent No. 1,982,689 application filed May 16, 1931, and others before him, disclosed an iron core. The winding of Crossley is not new, for similar windings had long been used. The invention if any must reside in the patentee's combination of a specific core and coil, both of which were old, with certain relative and proportional dimensions. The claim is limited to the high-frequency class, and includes "a pancake winding having at least as many layers as turns per layer," "a tubular cooperating iron-containing core," the winding being mounted upon and concentric with the core. All of these specifications are taught by the prior art.

The final provision of the claim is that of proportions and it is, at its best, far from clear in its meaning. The limitation in this respect is that the thickness of the wall of the core, its external diameter, its length, the length of the winding and the radial depth of the winding, shall vary by not more than 25% proportionality to the numbers 12, 40, 46, 15 and 26 respectively. Johnson's expert testified that this does not mean that the numbers themselves are to vary 25% plus or minus but that the proportions which those figures represent may vary 25% plus and minus. Meissner's expert testified that the allowance of 25% plus or minus should be applied to the numbers themselves. There is sound cause to believe that this interpretation is correct, for Crossley did not state that the variations might be 25% from proportionality to the ratio between the numbers prescribed but said that it was 25% from proportionality to the numbers themselves. There being more than two elements involved, the divergent testimony of the two experts indicates that various persons would read the claim differently and that, therefore, it is ambiguous.

■ Irrespective of this, it should be observed that no limitation is prescribed as to the exact size of the core and coil, and it is obvious upon any interpretation that the claim purports to cover a wide range of possible coil and core combinations. Prior art includes many suggested devices from which Crossley and Neighbor do not materially differ. We believe there was no invention in the patent.

The file wrapper shows that the Patent Office, in considering the Polydoroff patent, cited none of the prior art that is here relied upon; that of the Crossley patent discloses no citation of prior art. Consequently the presumption of validity of either patent is greatly weakened. It cannot stand against pertinent art which was not considered by the examiner. Boynton v. Chicago Hardware Foundry Co., 7 Cir., 77 F.2d 799; Moran v. Protective Equipment, 7 Cir., 84 F.2d 927; Standard Oil Co. v. Globe Oil & Refining Co., 7 Cir., 82 F.2d 488.

We believe Crossley and Neighbors come within the language of the court in Fink v. Foscato, Inc., et al., 2 Cir., 79 F.2d 842 as follows (page 843): "While an invention should not be invalidated merely because it comes after experimentation, still the experiment which succeeds must require some ingenuity, if it is worthy of being granted a patent monopoly. * * * Merely to run down every obvious alley until the best route to the desired goal is found cannot be deemed invention. We cannot see that Fink did more. All his experiments were within the skill of any competent artisan in metal work."

■ Aside from the question of invention there is nothing in the record to show that Meissner infringed.

The third patent involved in this litigation is that to Polydoroff No. 1,982,689 granted December 4, 1934, for magnetic core material, upon application filed March 16, 1931. Claims 1, 2, 3, 4, 74, 75 and 76, as limited by disclaimer, and Claim 58 are in the suit. The District Court held the disclaimer void and the claims to which it applied as well as Claim 58 invalid. Claim 58, which was not affected by the disclaimer, is as follows: "A magnetic material including magnetic particles small enough to pass through a screen of 400 meshes to the inch, and a chemically-converted insulating organic substance in quantity of the order of 3% of the weight of the material." Claims 1, 2, 3, 4, 74, 75 and 76 in their original form appear in the foot-

note in ordinary type.[1] The modification of each by disclaimer appears in italics.

The disclaimer was filed April 28, 1936, the day before the trial began, and Ferrocart insists that its effect was to add additional elements to Polydoroff's claims rather than to limit them, attempting to effectuate a result that could be reached properly only by reissue. Johnson insists that the true effect was to narrow the scope of the claims without adding thereto anything not taught by the specifications. Obviously, if a disclaimer purports to widen the invention and to make the claim broader, it is invalid. It cannot be used to change the character of the invention or to make a new patent. But if the reasonable intendment of the specifications is to disclose that the part disclaimed is separable from that retained, then the part disclaimed, if no new element is added, will not affect the residue provided the latter includes enough to support the claim of invention. A disclaimer is proper when

1. A compressed comminuted magnetic material having (a) individually-insulated particles and (b) a substantially constant permeability for a band of radio frequencies at least one octave wide. (c) *substantially all of the particles are capable of passing through a screen having 400 meshes to the inch (d) the compressed material has an apparent permeability of not less than 7, (1) at a frequency of from 300–1400 kilocycles:* (2) *at a magnetic intensity between 0.01 and 10 gauss* (e) *the compressed material has a resistivity of at least 10 ohms per centimeter cube.*

2. A compressed comminuted magnetic material having (a) individually-insulated particles and (b) a substantially constant permeability for a band of frequencies between (1), 1 kilocycle and 500 kilocycles (c) *substantially all of the particles are capable of passing through a screen having 400 meshes to the inch (d) the compressed material has an apparent permeability of not less than 7, (1), at a frequency of from 300-1400 kilocycles;* (2), *at a magnetic intensity between 0.01 and 10 gauss* (e) *the compressed material has a resistivity of at least 10 ohms per centimeter cube.*

3. A compressed comminuted magnetic material having (a) individually-insulated particles and (b) a substantially constant permeability 1. at frequencies of from 300 to 1400 kilocycles (c) *substantially all of the particles are capable of passing through a screen having 400 meshes to the inch* (d) *the compressed material has an apparent permeability of not less than 7, (1), at a frequency of from 300-1400 kilocycles,* (2), *at a magnetic intensity between 0.01 and 10 gauss (e) the compressed material has a resistivity of at least 10 ohms per centimeter cube.*

4. A compressed comminuted magnetic material having (a) individually-insulated particles and (b) a substantially constant permeability for a range of magnetic intensities between .01 and 10 gauss (c) *substantially all of the particles are capable of passing through a screen having 400 meshes to the inch (d) the com-*

pressed *material has an apparent permeability of not less than 7, (1), at a frequency of from 300-1400 kilocycles, (2), at a magnetic intensity between 0.01 and 10 gauss* (e) *the compressed material has a resistivity of at least 10 ohms per centimeter cube.*

74. Compressed magnetic material including minute magnetic particles, characterized in that (a) substantially all of said magnetic particles are, (1), capable of passing through a 400-mesh screen and, (2) are insulated, and that, (3), the compressed material has an apparent permeability of not less than 7 and, (4), a resistivity of at least 10 ohms per centimeter cube (b) *the compressed material has said apparent permeability of not less than 7 (1), at a frequency of from 300 to 1400 kilocycles, (2), at a magnetic intensity between 0.01 and 10 gauss.*

75. Compressed magnetic material including insulated magnetic particles of such dimensions and so closely related that (a) said compressed material has (1) an apparent permeability of not less than 7, and (2), a resistivity of at least 10 ohms per centimeter cube (b) *substantially all of the particles are capable of passing through a screen having 400 meshes to the inches (c) the compressed material has said apparent permeability of not less than 7 (1), at a frequency of from 300 to 1400 kilocycles, (2), at a magnetic intensity between 0.01 and 10 gauss.*

76. Compressed magnetic material including (a) magnetic particles approximating in size .005 millimeter, (1), said particles being insulated and, (2), so closely related that said compressed material has an apparent permeability of not less than 7 and, (3), a resistivity of at least 10 ohms per centimeter cube (b) *substantially all of the particles are capable of passing through a screen having 400 meshes to the inch (c) the compressed material has said apparent permeability of not less than 7, (1), at a frequency of from 300 to 1400 kilocycles, (2), at a magnetic intensity between 0.01 and 10 gauss.*

the patentee has been wrong in asserting that the whole claim is new but right as to a part which constitutes invention and which does not depend upon what he disclaims.

Claim 1 originally included a broad claim for any compressed comminuted magnetic material having individually-insulated particles and a substantially constant permeability for a band of radio frequencies at least one octave wide. It seems to us clear that the disclaimer of the claimed composition of material except when the .particles are capable of passing through a screen having 400 meshes to the inch and when the compressed material has an apparent permeability of not less than seven at a frequency of from 300-1400 kilocycles, at a magnetic intensity between 0.01 and 10 gauss, and when the compressed material has · a resistivity of at least 10 ohms per centimeter cube, added nothing new to the claim but limited the originally broad claim to one within the specified limitations of the disclaimer. The record indicates that the Polydoroff claim was too broad and, as constituted, included many compositions that were old. Consequently, truly to represent his alleged invention, the patentee found it necessary to disclaim as to all such devices as were not within the specific limitations of his allegedly new teaching. In other words, if he taught anything it was the making of a core with the specific limitations appearing in the claim as affected by the disclaimer. He recited in his specifications that there were several well known methods of producing core material suitable for socalled high-frequencies in which variously finely-divided particles with insulation of each particle were employed, the object being to impart to the cores of loading coils at moderately low frequencies, a high initial permeability. He said that the requirements for core permeability are considerably smaller for high frequencies than for the low ones; that apparent permeability is usually taken as "the ratio of the inductance as increased by the iron, to the air-core inductance." "Effective permeability" is a term used to indicate this same inductance ratio without regard to whether the core totally or only partially surrounds and encloses the field of the coil. His measurement of apparent permeability he made with a core of a substantially closed type. He pointed out that the effective permeability must be "in the order of eight." He indicated the necessity of insulating the magnetic particles and taught the fact that the smaller the particles, the smaller the losses. He stated the results of his investigation and study of iron powder, reduced by hydrogen, and said that particles of iron produced by chemical reaction of hydrogen constituted the best material. He pointed out that the values of permeability recited by him are for a frequency of 500 kilocycles and for magnetizing forces between .01 and 10 gauss. He discussed the inductance increase and the resistance increase and said that the ratio of the two quantities should be taken as the measure of the "goodness" of the core material, and set up computed factors of merit for toroidal types of cores. His description and specifications are long and in great detail, and from an examination thereof, we conclude that the claim was not broadened by the disclaimer; that each of the specified limitations brought about by the disclaimer was sufficiently described in the application of the patent as to be embodied in the claim after disclaimer, and that those limitations are consistent and in accord with the specifications and teachings of Polydoroff.

Without discussing the specific limitation as to each claim affected by the disclaimer, what we have said with regard to Claim 1 is applicable to each one of them. We think the disclaimer is within the statute, that it adds no new elements, that it diminishes the scope of the claims of the patent without prejudicing the rights of any one. Byrne Mfg. Co. v. American Flange & Mfg. Co., Inc., 6 Cir., 87 F.2d 783; Dunbar v. Meyers, 94 U.S. 187, 24 L.Ed. 34; Altoona Publix Theatres, Inc., v. American Tri-Ergon Corp., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005. Consequently we shall consider the claims as limited by the disclaimer.

The application upon the second Polydoroff patent followed by some 18 months that which led to the first No. 1,982,690. It relates, as has been observed, to magnetic core materials, and the process of making them. Claim 58 is limited to magnetic material made of particles insulated, the proportion of the insulating material being 3% of the weight of the magnetic material, the particles being small enough to pass through a screen of 400 meshes to the inch. The patentee states that the size of the crystals is "of the order of .001 millimeter." This is equivalent to a diame-

ter of one micron, whereas the claim specifies particles small enough to pass through a screen of 400 meshes to the inch, which includes particles as large as 38 microns in diameter. Again the patentee states that the crystals "may group together to form masses of the order of .005 millimeter." Such particles are 5 microns in diameter. Articles passing through a 400 mesh screen have a cross-sectional area of 1,444 square microns while those 5 microns in diameter possess an area of only 25 square microns. In other words the patentee suggests particles varying from 1 micron in diameter to others 57 times as large, passing through the 400 mesh screen. If the spherical contents of the particles are taken into consideration, the wide range of the suggested sizes is even more apparent.

We have seen that other delvers in the art had taught the use of variously sized particles in the making of magnetic cores. What we have previously said in that connection is applicable here. We think there is nothing new or novel in what Polydoroff said with regard thereto and that he was taught by the prior art everything that was necessary to lead him to the conclusions and thoughts he expressed in the specifications, description and claims in this respect.

The second element is a chemically converted insulating organic substance. Such an element was old in the art. It would be futile to recite the history or contents of the same. Polydoroff, however, prescribed that the quantity of the organic insulating substance should be "of the order of 3% of the weight of the material." Again, we doubt that this specified limitation could amount to invention in view of what had been disclosed; rather, we believe invention did not lie in this specified limitation. Compounding and insulating the particles was old. Polydoroff conducted further experiments under what he had taught in his first patent and others before him, and arrived at what he concluded was the best proportion of weight of insulating material to core material and the best method of producing iron particles; but this was not invention. It was merely the carrying forward by the skilled artist of thoughts that had long before been suggested. We doubt the efficacy of this prescription of relative proportions by Polydoroff, as invention is negatived by Eisenmann No. 1,783,561 which teaches 2.97% proportion.

However, if we are wrong in this conclusion, it seems clear that Ferrocart does not infringe. It does not make its proportion of insulating material to core material 3% but more nearly 5.8%. Furthermore the Ferrocart cores are made of compressed carbonyl particles created by means of the thermal decomposition of carbonyl iron and, therefore, are not within the recommended material of Polydoroff. In this respect Ferrocart follows the prior art rather than Polydoroff.

We think the conclusions we have reached with regard to Claim 58 apply equally well to those as to which the disclaimer is applicable. One limitation imposed by the disclaimer is that the compressed material shall have an apparent permeability of not less than 7 at a frequency of from 300 to 1400 kilocycles. "Apparent permeability" is a term of no fixed meaning. The permeability of a core material is arrived at by comparing the inductance of a coil wound on the material with the inductance of the same coil wound on an air-core. The ratio is arrived at by dividing the iron core inductance with the air-core inductance. As suggested by Ferrocart, apparently the most accurate way of determining such ratio is to provide a core and coil combination in which the magnetic core may be removed so that the inductance may be first computed with the magnetic core in place and then again when the magnetic core has been removed. There is much discussion in the record of "effective permeability" and "apparent permeability." Effective permeability is that of any specified core measured with any specified coil. On the other hand, apparent permeability results from a measurement of certain specific core and coil combinations, these being designed to give the highest permeability which can be reasonably obtained. The parties confess that the matter is vague and indefinite to them and to a court, which must derive its scientific knowledge from the record, obviously, it must be at least equally so. We believe Polydoroff's teachings in this respect are nothing more than a computation of the specific relationship found in his combination.

At any rate, it is apparent that Ferrocart does not in its material achieve apparent permeability of "not less than 7 at frequencies of 300 to 1400 kilocycles" as prescribed by Polydoroff. Apparently the per-

meability ratio of Ferrocart is not in excess of six, rather than the minimum of seven prescribed by Polydoroff.

There are many formulae for calculating permeability and they are discussed at length by the witnesses. Apparently, by the use of these formulae it is a simple matter for one skilled in the art to determine the proper proportions and produce a core of any desired permeability within very wide limits. The method of achieving permeabilities is based upon the various degrees of separation of the particles. Speed and Elmen discussed a certain grade C material used in the ship-to-shore work, possessing a permeability of 26.3, much above that which Polydoroff mentions as the lower limit. To decrease the permeability to Polydoroff's figure requires merely the addition of more binding and insulating material or a corresponding reduction in the magnetic material. The pressure under which the material is compacted has some bearing, because it brings the magnetic particles more closely in contact with each other and leaves less space unfilled. The grade C cores mentioned were highly compressed, and this fact contributed to a high degree of permeability.

What we have said in this respect bears also upon the limitation of the disclaimer that the apparent permeability should be at a magnetic intensity between "0.01 and 10 gauss." Expert witnesses for each of the parties discussed this limitation. Langley, testifying for Johnson, confessed that there was nothing in the Polydoroff patent specifically directed to its specific limitation; that he could find no element or constituent directed to securing this result. The limitation in ordinary language indicates merely that the apparent permeability is to be measured by means of passing comparatively small currents through the coil placed on the core. These currents are similar to those used in the ship-to-shore work and mentioned in the Speed-Elmen Paper. The evidence indicates clearly that there is nothing new or unusual in this narrowing of the claim, for currents of these intensities, according to the evidence, were generally present in the devices of the prior art.

The disclaimer imposes the further limitation that the material shall have a resistivity of at least "10 ohms per centimeter cube." It is doubtful if this expresses any desirable result, for if each of the particles of the magnetic material is properly insulated, the resistivity, under the teaching of the record, would be very large, varying with the character of the insulating material. Lower resistivities result from the fact that to some extent the insulation of the individual particles is not complete, resulting in a series of particles through which currents may pass. We cannot attribute to this limitation a teaching of anything useful or novel over the prior art. The limitation of Speed-Elmen is 10 ohms per centimeter cube. Other prior publications point clearly to similar effects. Furthermore it is to be observed that resistivities of the alleged infringing devices range from 20 ohms per centimeter cube up to 68,000 ohms per centimeter cube. This is not within the limitation, prescribing a resistivity of at least 10 ohms per centimeter cube.

We believe that the court was right in its conclusion that the claims are invalid. If they are valid, they are not infringed.

Our conclusion with regard to each of the three patents involved in this litigation results not only from our examination of the record but also from the applicable decisions of the courts. The language of the Supreme Court in De Forest Radio Co. v. General Electric Co., 283 U.S. 664, 678, 51 S.Ct. 563, 75 L.Ed. 1339, where the court was dealing with an improvement in a high vacuum tube over a low vacuum tube, is pertinent. The degree of vacuum within the tube was the crucial feature of the alleged inventions, just as here the crucial feature is largely in the size of the magnetic particles. The Supreme Court concluded that all the details, specifications and claims of the patentee should be summed up in a simple statement that when the requisite vacuum was obtained the characteristics would necessarily be present, for the vacuum tube of the patent was one which would produce the characteristics. The language is (page 568): "The narrow question is thus presented whether, with the knowledge disclosed in these publications, invention was involved in the production of the tube, that is to say, whether the production of the tube of the patent, with the aid of the available scientific knowledge that the effect of ionization could be removed by increasing the vacuum in an electric discharge device, involved the inventive faculty or was but the expected skill of the art. The question is not, as respondent argues, whether

Lilienfeld or others made a practical high vacuum tube, but whether they showed how it could be made and demonstrated and disclosed the relationship of the discharge to reduced pressure, and how to reduce it. See Corona Cord Tire Co. v. Dovan Chemical Corporation, 276 U.S. 358, 384, 48 S.Ct. 380, 72 L.Ed. 610." " * * * It [respondent] adopts also the statement in the opinion of the court below, upon which its decision turned, 'a vacuum, or indeed, change of vacuum, isolated and standing by itself, is not the Langmuir invention, but it is a working tube in which all the elements, cathode, plate, vacuum, so co-ordinate and interwork that the current flow is not affected by gas,' a statement which, as we have already pointed out, takes no account of the scientific knowledge, available before Langmuir, that increase of vacuum in well known devices was all that was necessary to produce the desired result." See, also, Standard Oil Co. v. Globe Oil & Refining Co., 7 Cir., 82 F.2d 488, 494. As we concluded in Hajek v. Radio Corporation of America et al., 7 Cir., 83 F.2d 1, the claims in these various patents include nothing new other than the qualities claimed to be due to such specified form of structure, and the elements contained in the structure being old and the teachings with regard to their effects and uses being replete in the art, we think that *no invention was involved in any of the same.*

In support of its claim of unfair competition upon the part of Johnson, Ferrocart offered evidence until the court announced that that already received was sufficient to show unfair competition and some injury and that the amount thereof would be proper only upon an accounting.

On January 15, 1935, Johnson caused to be written letters to Ferrocart and its customer Meissner giving notice of infringement of seven patents, including the three discussed herein, saying that they had been infringed and that unless assurance was given that such infringement would cease, proceedings would be instituted to protect the rights of the owners of the patents. Following this, Johnson brought suit for infringement of only two of the patents, Polydoroff No. 1,982,690 and Crossley, et al., No. 1,978,568, claiming no infringement of the other five. Despite this action, however, Johnson continued to notify customers of Ferrocart of infringement of all seven patents and to threaten suit for the infringement thereof. To some of them, it sent second notices, without limiting the threat to bring suit on two of the patents but apparently referring to all seven included in its prior notices. There was evidence also of customers being threatened with infringement suits by telephone calls and by personal calls. The President admitted that he had threatened suit by telephone to certain parties, and at least one of the customers of Meissner suggested that it apply for injunction against intimidation and harassing of customers. As a result of these threats Meissner was compelled to furnish an indemnity bond to one of these customers to prevent cessation of the existing relationship and to other customers, guarantees.

When Johnson filed its counterclaim in the suit brought for declaratory judgment upon all seven patents, it admitted that there had been no infringement of three of the seven and later, before trial began, admitted still further that a fourth patent had not been infringed. Thus, it appears clearly that these notices and threats included four patents upon which no claim for infringement has ever been presented. The court believed that this action constituted unfair competition and the evidence is such that we are not disposed to disturb this finding of fact and conclusion of law.

A patentee may properly give notice to an alleged infringer. He may bring suit. He may threaten suit against the infringer, so long as he acts in good faith without undue pressure. His steps in protection of his monopoly will be protected. But when two notices of infringement of seven patents, four of which have been abandoned as grounds for infringement, are given, it would seem that the patentee has exceeded his legal rights and that the trial court may justly find from the facts and circumstances that he has not acted in good faith.

As said in Panay Horizontal Show Jar Co. v. Aridor Co., 7 Cir., 292 F. 858, 859: " * * * The practice of trying suits in newspapers or circulars, in order to scare or daunt competitors, is pernicious and apparently growing. While courts are always open to protect patentees or manufacturers who have established a business which is being unfairly assailed, they cannot permit or sanction the use of the court's name, in advance of adjudication (or falsely after adjudication), to harass or obstruct a rival. A patentee who re-

sorts to such practices comes into court with unclean hands, and on that ground alone will be denied the relief to which he otherwise might be entitled." The proper forum for the trial of legal controversies is the court, not in futile correspondence making threats beyond claims of legal rights of the parties. When suits are threatened upon patents not asserted in suits thereafter brought against others, the court is justified in concluding that there was some ulterior motive in the action. Maytag Co. v. Meadows Mfg. Co., 7 Cir., 35 F.2d 403; A. B. Farquhar Co. v. National Harrow Co., 3 Cir., 102 F. 714, 49 L.R.A. 755.

The court found also that Ferrocart had been guilty of unfair competition in the representation that magnetic molded cores sold by Ferrocart were manufactured under Letters Patent of the United States and that such product was the pioneer core for radio. Polydoroff's applications were made in August, 1929 and March, 1931. In the years of 1934 and 1935, Ferrocart, in its advertisements, said: "Ferrocart, in its new laminated and molded forms, has been designed for the American market backed by two years' quality use by leading European manufacturers. * * * is covered by many patents * * * in foreign countries * * * and by applications pending in the United States and foreign countries." These advertisements said that these cores were longest in use, their economic cost uniform and that U. S. and foreign patents were being issued or pending. In an article the President of Ferrocart in 1934 said that the invention had originated with Vogt, a European scientist, and that the core material, which might be made in either laminated or molded form and in any desired shape, was capable of machining and mechanically solid; that it had remained for Vogt, a pioneer in sound films, to perfect an iron core material having these characteristics and that the product had been commercially perfected. This is all the evidence of representations made, but defendant insists that Ferrocart adapted its product to conform to Johnson's product; a contention of little weight in view of our finding that there was no infringement.

Vogt United States patent No. 2,011,-697 was granted August 20, 1935, on an application filed October 10, 1932; it corresponded to a German patent filed November 12, 1931; Vogt U. S. patent No. 2,011,698 was granted August 20, 1935 on an application filed February 5, 1934, corresponding to a German application filed June 1, 1933. There were various other applications filed by Vogt February 7, 1934, March 8, 1933, April 21, 1934, June 1, 1933 and June 8, 1933. Ferrocart is licensed to manufacture its cores under Hochheim U. S. patents No. 1,840,-286 and German patent No. 473,480, corresponding to British Hochheim patent No. 269,770, all prior to Johnson's patents. The Hochheim patents cover the molded form of core purchased by Ferrocart and delivered by it to Meissner and these cores are marked with the U. S. Hochheim patent mark. Hochheim made molded cores; Vogt apparently largely laminated cores. The advertisement referred to both. Whether Hochheim was the pioneer or one of the pioneers is rather immaterial. He came comparatively early in the art and from him Ferrocart obtained a license.

We see nothing unfair or improper in the advertisement submitted. It was somewhat boastful, but it expresses obviously only the opinion of the advertiser. If, knowingly, false assertions were made, Ferrocart should be held to account, but it obviously had a right to assert its protection by the Hochheim and Vogt patents and to insist that they were pioneers in the art. Prima facie at least the statement was true and has not been overcome.

On September 16, 1932, Vogt, in describing Ferrocart cores, said that by the use of a solid core containing finely divided high-permeability metal, it had been found possible to construct miniature coils rivaling in efficiency those of the air-core type; that the new metal Ferrocart consisted of minute particles of high-grade magnetic material, so separated by means of a special insulation process that eddy-current losses were reduced to a minimum. He said that the material was made in different shapes; that it could be stamped out or sawed and individual parts pressed together by the application of heat. Apparently Johnson's first printed description of iron cores appeared in May, 1934, almost two years later and Johnson's testimony is that May, 1934, was the earliest commercial exploitation of its Poly-Iron core. Apparently there was reasonable ground for Ferrocart's assertion that it was a pioneer. Furthermore there is nothing in any of the advertising or articles reflecting in the slightest degree upon the patents or

products of Johnson. Nothing derogatory to Johnson or its associate Aladdin appears in any of them. We conclude that the District Court was in error in finding Ferrocart guilty of unfair competition.

The decree involved in appeals and cross-appeals 6023 and 6136 will be reversed in so far as it finds the first Polydoroff patent valid and infringed. In all other particulars it will be affirmed. The decree involved in the appeals and cross-appeals 6137 and 6138 will be reversed in so far as it finds Ferrocart guilty of unfair competition and the first Polydoroff patent valid and infringed, and in all other respects it will be affirmed and the cause remanded to the District Court for further proceedings in accord with this opinion.