170 F.Supp. 871 (1959)
ARMOUR RESEARCH FOUNDATION OF ILLINOIS INSTITUTE OF TECHNOLOGY, a non-profit corporation,
and
Minnesota Mining & Manufacturing Company, a corporation, Plaintiffs,
v.
C. K. WILLIAMS & CO., Inc., a corporation, Defendant.
ARMOUR RESEARCH FOUNDATION OF ILLINOIS INSTITUTE OF TECHNOLOGY, a non-profit corporation, Plaintiff,
v.
TECHNICAL TAPE CORPORATION, a corporation, Defendant.
Civ. A. Nos. 3200, 3438.
United States District Court E. D. Illinois.
February 27, 1959.
*872 Carlton Hill, Benjamin H. Sherman, Hill, Sherman, Moroni, Gross & Simpson, *873 Chicago, Ill., Charles E. Feirich, Feirich & Feirich, Carbondale, Ill., for plaintiffs.
William H. Abbott, Carpenter Abbott, Coulter & Kinney, St. Paul, Minn., for plaintiff Minnesota Mining & Manufacturing Co.
Albert C. Johnston, Walter D. Ames, Pollard, Johnston, Smythe & Robertson, New York City, for defendant C. K. Williams & Co.; Marcus A. Hollabaugh, Hollabaugh & Jacobs, Washington, D. C., of counsel.
Robert D. Spille, Curtis, Morris & Safford, New York City, for defendant Technical Tape Corp.
Henry Driemeyer, Pope & Driemeyer, East St. Louis, Ill., for defendants.
JUERGENS, District Judge.
This litigation was commenced by the plaintiff Armour Research Foundation of Illinois Institute of Technology (hereinafter referred to as Armour) against C. K. Williams & Co., Inc. (hereinafter referred to as Williams), defendant in Civil Action No. 3200 and plaintiff Armour against Technical Tape Corporation (hereinafter referred to as Technical Tape), defendant in Civil Action No. 3438. Minnesota Mining and Manufacturing Company (hereinafter referred to as Minnesota) was subsequently, by order of this Court, brought in as a necessary party plaintiff. The two suits were consolidated for trial.
The plaintiffs charge infringement by the defendants of United States Letters Patent No. 2,694,656, issued to Marvin Camras, who filed his application with the United States Patent Office on July 25, 1947. The patent issued November 16, 1954. The inventor Marvin Camras assigned the patent to Armour. Minnesota is an Armour licensee and has the exclusive right to grant sub-licenses under the patent.
The defendants filed their separate answers to the respective complaints, alleging invalidity and unenforceability of the patent and denying infringement. In addition, Williams filed its counterclaim seeking an adjudication of the invalidity and non-infringement of the patent in suit and counterclaimed against both plaintiffs for violation of the Anti-Trust Law.
This Court has jurisdiction under the patent laws of the United States.
In support of their allegations of infringement the plaintiffs rely on claims 3, 8, 10, 14, 25 and 26 of the patent in suit. These claims are as follows:
"3. A ferromagnetic iron oxide material adapted to form an element of a magnetic impulse record member, said material consisting essentially of acicular crystalline particles uniformly small in size and not over 6 microns in their greatest dimension of a synthetic magnetic oxide of iron selected from the group consisting of magnetic ferrosoferric oxide Fe3O4, and magnetic gamma ferric oxide, Fe2O3, the selected synthetic magnetic oxide of iron having a cubic lattice structure, and said material having a coercive force value of between 200 and 550 oersteds and a ratio of Bfm/Br at H-1000 of not over 3 to 1.
"8. The method of making permanent magnet material which comprises precipitating a non-magnetic ferric oxide from solution in acicular crystalline form, heating said nonmagnetic ferric oxide in a reducing hydrogen atmosphere to a temperature of about 750° F. for a sufficient length of time to reduce said ferric oxide to a magnetic ferrosoferric oxide, cooling the ferrosoferric oxide in the presence of a reducing atmosphere to room temperature and then exposing said ferrosoferric oxide to the air to recover a ferrosoferric oxide having a coercive force value between 200 and 550.
"10. The method of making magnetic material, which comprises precipitating a non-magnetic ferric *874 oxide from solution in acicular crystalline form and of a particle size less than 6 microns in greatest dimension heating said non-magnetic ferric oxide to a temperature between 500 and 1000° F. in a reducing atmosphere until the reduced oxide turns almost black, stopping the reaction at that point by cooling said reduced oxide in a reducing atmosphere to around room temperature and recovering ferrosoferric oxide of the same crystalline form and same order of particle size but having permanent magnet properties including a coercive force of over 200 oersteds and a Bfm/Br (H-1000) of not over 3 to 1 and reoxidizing said ferrosoferric oxide in the presence of oxygen at a temperature between 300° F. and 900° F. to produce a magnetic iron oxide consisting essentially of gamma Fe2O3.
"14. The method of making magnetic iron oxide which comprises providing a synthetic non-magnetic ferric oxide in acicular crystalline form and of particle size not over 6 microns in its greatest dimension, reducing said non-magnetic oxide at elevated temperatures to produce a ferrosoferric oxide and oxidizing said ferrosoferric oxide to gamma ferric oxide having permanent magnet properties including a coercive force of at least 200 oersteds.
"25. Ferromagnetic iron oxide selected from the group consisting of a synthetic ferrosoferric oxide, Fe3O4, and of a synthetic gamma ferric oxide, Fe2O3, adapted to form an element of a magnetic impulse record member, said iron oxide consisting essentially of uniformly small elongated crystals of less than about 1.5 microns maximum dimension having a length-to-width ratio of about 2.5 to 1 and higher, and having a cubic crystal lattice structure and a coercive force, Hc, within the range of 245 to 330 and remanence, Br, of above about 500 gauss.
"26. A magnetic impulse record member having a non-magnetic carrier and a coating adherently bonded thereto of a binder and magnetic material, said magnetic material being the ferromagnetic iron oxide defined in claim 25 and having a Br versus H characteristic that rises most rapidly at fields between 200 and 600 oersteds and relatively slowly at fields between 0 and 200 oersteds and at fields above 600 oersteds."
The patent in suit relates to a permanent magnetic material and to a method of making same. This permanent magnetic material is then impregnated or coated on a non-magnetic carrier to produce a magnetic impulse record member.
Magnetic recording was first discovered prior to the beginning of the present century by Valdemar Poulsen, a Danish physicist. He found that a mass of magnetizable material may be impressed with impulses varying in intensity in successive adjacent portions of the magnetizable mass which will retain these impulses. It was learned that a sound wave could be converted into a varying electric signal and it was further determined that by energizing an electromagnet with the electric signal a corresponding magnetic signal would be impressed on the record member as the record member was caused to pass over the electromagnet. It was further observed that when the same record member was again moved past the same or a similar electromagnet, an electric signal would be introduced into the electromagnet corresponding to the magnetic signal which had been impressed on the record member by its prior exposure to the effects of the electromagnet. These early experiments were in great part conducted using wire or metal tapes as the record member.
Prior to World War II the Germans had developed magnetic recorders using non-magnetic tape materials coated with magnetic iron oxides as the recording media. This use of magnetic iron oxide tapes as a recording media continued and *875 was advanced throughout the war years. These tapes were used on two different machines, the "Magnetophon" and the "Tonschreiber". The Magnetophon was used by the German radio and broadcasting industry for recording broadcasts which were subsequently replayed and transmitted. This recording machine was a bulky instrument, having a tape speed of approximately 30 inches per second. This required large reels in order to provide programs of any extended length. The Tonschreiber was primarily used by the German armed forces in transmitting messages and could be set to operate at any speed from 0 to approximately 30 inches per second. Both of these machines utilized the German low coercive force oxide tapes.
During the period referred to above the magnetic recording art in the United States was limited to the use of wire or tape. Iron oxides were not generally used as recording media in the United States until after the conclusion of World War II when the Brush Development Company of Cleveland, Ohio, placed on the market the Brush "Sound-mirror". This machine used as a recording media a low coercive force magnetic oxide tape similar to that used by the Germans in their Magnetophon and Tonschreiber. The basic difference between the German and Brush machines was that the Soundmirror operated at a speed of 7½ inches per second. This speed has become the standard speed of American tape recorders.
While the work on the Soundmirror was progressingit became the first American machine for home usethe Indiana Steel Products Company had produced a tape recorder designed to use high coercive force tapes in order to obtain high frequency response at low speeds. The tape used with this machine had a coercive force of around 250 oersteds and utilized a magnetic powder having particle sizes in the 1 micron range for the recording media. The coating material used on this tape was not the magnetic iron oxides claimed as an invention in the patent in suit nor was it similar to that used on the German tapes.
On June 1, 1946 Marvin Camras, the inventor of the patent in suit, applied for a patent on an "apparatus for magnetic recording" and on October 31, 1950 Patent No. 2,528,261 issued (Dx. N). In that patent he claimed as his invention a magnetic recorder designed to use a recording media having a permeability of less than 50 and a coercive force of over 100 oersteds, preferably over 250 oersteds. With the advent of this magnetic recorder the first great need for high coercive force and low permeability tapes arose.
On July 25, 1947 Marvin Camras filed his application and on November 16, 1954 the patent in suit was issued.
The important criteria of his patent, according to Mr. Camras, are:
(1) A relatively high coercive force, generally between 200 and 550 oersteds.
(2) Initial magnetization curve with a relatively gentle slope to an Ho point of about 250 gauss.
(3) A rapid rise from about 200 to 600 oersteds.
(4) A high remanence above about 500 gauss and a Bfm/Br ratio of less than 3 to 1.
(5) A synthetic material comprised of particles of preferably less than 1.5 microns and not more than 6 microns in maximum dimensions and consisting of acicular or elongated particles.
The defendants assert the invalidity of the patent and declare that the patent should not have been issued.
One of the asserted grounds of invalidity is that the oxides claimed as an invention by Camras are old in the art, as was also the use of magnetic iron oxides for magnetic impulse record members.
In support of this contention the defendants point to the Johnson patent (British Patent No. 466,023) (Dx. F) dated November 18, 1936. This patent is entitled "Improvement in the Manufacture and Production of Sound Record *876 Carriers" and claims invention of electromagnetic recording and reproduction of sound according to the known process suggested by Poulsen whereby sound carriers have been employed, which consist of coherent magnetic materials, preferably in the form of strips or wires of magnetic metals. The patent claims that it has also been proposed to make use of finely divided magnetic material and that magnetic metal oxides in a finely divided state are eminently suitable for electromagnetic recording and reproduction of sound by means of sound carriers consisting of magnetic materials on or in a non-magnetic carrier material. The oxides Fe3O4 and gamma Fe2O3 are especially suitable.
"A suitable process for the preparation of the oxides in a very finely divided state consists in the decomposition of complex metal salts, as for example iron ammonium salts, or complex metal compounds which contain organic radicals such as pyridine. Such methods of preparing oxides are known per se, but it was hitherto not known that magnetic metal oxides when prepared in such a way are highly suitable for sound recording purposes * * *
"It has been found that the oxides to be used according to this invention fulfil the said requirements to a high degree. The main reason for this is the extreme fineness and the very great uniformity in the size of the particles. For example it is possible to incorporate the magnetic material according to this invention in the sound record carrier in a particle size of 1/1000 millimetre or less; with the processes hitherto proposed for the purpose this is either impossible or only possible with difficulty. The magnetic properties of the oxides, in particular their induction and remanence with low field strengths, are favourable for their use as sound record carriers. The high coercive force ensures a good stability of the sound recording. * * *
"The following Examples will further illustrate how the said invention may be carried out in practice but the invention is not restricted to these Examples."
Johnson sets out five examples of methods of preparing oxides for use in the invention. However, the patent clearly indicates that the method of preparation of the oxide is not restricted to the examples.
The Patent Examiner rejected several claims of the Camras patent as being unpatentable over the Johnson British patent (p. 48, Dx. G). To overcome this objection (p. 48, Dx. G) Camras conducted experiments of three examples of the British patent. By following these methods low coercive force materials were obtained (pp. 63, 64, Dx. G).
On page 64 of this exhibit the effect of temperature upon the magnetic properties of hydroxides was illustrated. Crystals of Fe2O3.H2O in the form of light yellow acicular crystals of a particle size from ¼ to about 1½ microns in length and 1/10 to 3/10 microns in width were produced according to the reactions described in the Camras application. The resulting particles were then reduced in an atmosphere of hydrogen at temperatures of 300° F., 400° F. and 1200° for varying periods of time. The resulting oxides proved in the case of the 300° F. and 400° F. reductions to have coercive force values and remanence values too low to obtain a measurement, and in the case of the 1200° F. reduction a coercive force of 30 was attained.
Since Camras in his experiments failed to follow the teachings of the prior publications for the method of reducing both synthetic and natural iron oxides, it is not surprising that he obtained the low coercive force above indicated.
The Williams and Thewlis article (Dx. 1-Y) dealing with heat treatment of gamma monohydrate of ferric oxide (1931) disclosed that reduction of gamma hydrate at the temperature of 350° C. was necessary for practically complete dehydration. Temperatures below this *877 point did not show a satisfactory dehydration while temperatures in excess of 500° C. showed the beginning of a conversion from the gamma to the alpha oxide. The gamma hydrate used in the Williams and Thewlis teachings was prepared from a dilute solution of ferrous chloride, by precipitation with calcium hydroxide in the form of a suspension in water and subsequent oxidation at room temperature.
At the Inter-Partes demonstration at Easton, Pennsylvania, the Williams and Thewlis publication was followed in conducting the H series demonstration. In this demonstration the hydrate was reduced at 350° C. (R. 2049). The particles of the oxide produced in the H demonstration were found to be acicular and smaller than 1 micron in maximum dimension (R. 2051) (Dx. 1-B-1, p. 33). The oxides produced in this demonstration showed a coercive force of over 200 oersteds and a Bfm/Br ratio of less than 3 to 1 (R. 3166, 3167).
By following the teachings of the Williams and Thewlis publication, as was done at the Inter-Partes H demonstrations, an oxide clearly conforming to the patented oxide was obtained.
Another prior publication showing the effect of heat treatment on magnetic properties of iron oxides is found in the Kraeber and Luyken publication (Dx. 1-Z-1 and 1-Z-2).
This article was published in Germany in 1936 by the German-Kaiser-Wilhelm Institute. It discloses methods by which iron oxides may be reduced and oxidized in order to provide certain magnetic properties. At the Easton Inter-Partes demonstrations an oxide, identical to Camras' oxide, was produced by following the disclosures of the publication.
The plaintiffs contend that the article fails to anticipate the Camras patent, notwithstanding the fact that oxides identical to those disclosed in the Camras patent were produced by following the teachings of Kraeber and Luyken at the Easton demonstrations. They assert that the publication does not disclose the use of these oxides for magnetic recording media; that the Camras measurements, which are necessary in order to determine that the oxide sought has been obtained, are not disclosed anywhere in the article; and that the starting material used at the Easton demonstration was not the Merck iron hydroxide but rather was a product of the defendant Williams Company. This latter objection is strongly urged by the plaintiffs in their claim that the Camras oxide was not anticipated by this publication.
The defendants used a substitute hydroxide (a commercial product of defendant Williams known as YLO-1788); this iron hydroxide corresponds to the Merck iron hydroxide prescribed as a starting material in the publication. The Court finds that the defendants have justified their use of the substitute hydroxide by showing that:
(1) They attempted to obtain the Merck iron hydroxide as prescribed by Kraeber and Luyken, but none was available. (p. 73, Dx. 3-E).
(2) The substitute starting material (YLO-1788) was of the same extremely small particle size as Merck iron hydroxide. The evidence discloses that the particle size of the prescribed and the substitute hydroxides are the same. (p. 11, Dx. 3-E) (pp. 16, 17, Dx. 1-Z (2)) (p. 14, Dx. 3-E).
(3) The Merck and the YLO-1788 hydroxides both consisted of acicular particles. This is borne out by the evidence. (pp. 62 and 69, Dx. 3-E, and pp. 8, 16 and 17, Dx. 1-Z-2).
Except for the use of a substitute starting material, the procedures outlined in the Kraeber and Luyken article were followed in producing the P series demonstration oxides. The starting material (p. 11, Dx. 3-E) was roasted at a temperature of 400° C. for one-half hour in the presence of carbon monoxide gas (pp. 8, 9, Dx. 3-E). The kiln was then removed from the heating blanket with nitrogen continually passing through and was placed on the floor to cool down to room temperature (pp. 18, 19, Dx. 3-E). This *878 procedure follows test No. 3, table 5, page 30 of the Kraeber and Luyken article (Dx. 1-Z (2), p. 8, Dx. 3-E). In the second step in the procedure materials produced in the first step were placed in a rotary kiln and heated to 200° C. This temperature was maintained for a period of one hour as air passed through the kiln. The kiln was then removed from the heating blanket and cooled down to room temperature (p. 27, Dx. 3-E). The second step of the procedure follows the procedure outlined in experiment 7, table 6, page 36 of the publication (Dx. 1-Z(2)).
The oxide and tapes produced correspond in all respects to the Camras patent material (pp. 2-5, Dx. 1-B-3) pp. 1-3, Dx. 1-B-4).
The United States Department of Interior Bureau of Mines Bulletin No. 425, dealing with the Magnetic Separation of Ores, at page 136, teaches the Effect of Heat Treatment on Iron Oxides, Ferrites and Ilmenite and provides as follows:
"Properties of Gamma Fe2O3 and Ferrites
"It has long been known that under certain conditions Fe2O3 is ferromagnetic. This form has been shown by X-ray spectrometry to be cubic, whereas the ordinary paramagnetic form is hexagonal.
"Of the various methods for preparing this ferromagnetic Fe2O3 two may be used to treat minerals for magnetic separation. By the first method Fe3O4, regardless of its method of formation, may be the starting point. Reactive varieties resulting from the gaseous reduction of ordinary Fe2O3 or from drying precipitated, hydrated Fe3O4 are readily converted by heating in air at 220° to 550° C. or by subjecting them to the action of oxidizing solutions to gamma Fe2O3. Heating at higher temperatures forms ordinary Fe2O3. Nonreactive Fe3O4, exemplified by most natural magnetities, may be converted to the reactive type by oxidation to the ordinary Fe2O3 followed by gaseous reduction.
"By the second method gamma ferric oxide hydrate is heated at 250° to 300°C. (347) so as to produce the ferromagnetic gamma Fe2O3. The transformation temperature is not sharp, but overheating must be avoided to prevent further conversion to ordinary Fe2O3.
"Gamma ferric oxide hydrate may be formed by the oxidation of ferrous hydroxide or of mixtures of ferrous and ferric hydroxides (210); its preparation may be favored by the use of certain organic nitrogen-containing compounds (15)."
The teachings of the above article disclose to one skilled in the art that in order to obtain a high coercive force oxide, reduction temperatures of between 220 to 500°C. must be followed and that overheating will destroy these magnetic properties.
In the demonstration Camras (Camras' affidavit, pp. 62, 63, 64, Dx. G) conducted for the benefit of the Patent Examiner it is important to note that the temperatures prescribed above were not followed. Although the Bureau of Mines Bulletin No. 425 was used as a reference by the Examiner in determining the validity of the Camras application, only pages 88 to 95 were considered, notwithstanding the fact that at page 136 the effect of heat treatment on iron oxides is disclosed. Could it be that Camras "religiously avoided" conducting an experiment based on this page of the publication?
The Court finds that the Williams and Thewlis, the Kraeber and Luyken, and the Bureau of Mines publications anticipated the oxide claimed by Camras as his invention. The Camras file wrapper (Dx. G) discloses that these publications were not cited to nor considered by the Patent Office as prior art publications. The Patent Examiner did not have the benefit of these publications when he considered the validity of the Camras application.
*879 The Court further finds that the Johnson British patent clearly teaches the use of magnetic iron oxides, both Fe3O4 and gamma Fe2O3, in a finely divided state and of a small particle size and of a high coercive force to be especially suited for use as a magnetic recording media. Although the examples of the method of preparing the oxide contained in the Johnson patent do not disclose the exact method of preparing the oxide claimed by Camras as his invention, yet by following the Johnson teachings and referring, as the patent teaches, to the magnetic oxide art as known and disclosed in prior publications, the Camras oxide is anticipated, as is the use of these oxides for magnetic recording members.
The Welo and Baudisch article published in August, 1934, (Dx. B) discloses a method whereby synthetic magnetite may be obtained by the reduction of gamma monohydrate and alpha monohydrate.
The starting material for the gamma ferric oxide of Welo and Baudisch is obtained by burning iron carbonyl in a plentiful supply of air, then reducing the material in sodium acetate or potassium nitrate at 320°C. for 10 minutes (p. 73, Dx. B). This article was followed at the Easton demonstrations. Reduction at 460°C. in acetate resulted in the production of oxides having Hc of over 200 oersteds, Bfm/Br of 3 to 1, rapid rise from 200 to 600. Reduction at 360°C. in potassium nitrate produced oxides having Bfm/Br of 3 to 1 and a coercive force of 200. (Dx. 1-B-1, pp. 34, 35, 36).
Electron micrographs taken of the demonstration oxides produced by following Welo and Baudisch show the presence of some particles with a length to width ratio of more than 2 to 1 (Dx. 1-R-5 and 1-R-6).
When viewing the particles under the definition of acicular, meaning 2 to 1 or more in length to width ratio, defendants' Exhibits 1-R-5 and 1-R-6 show the presence of acicular particles. However, the oxide produced by following Welo and Baudisch does not produce predominantly acicular particles as does the Williams IRN-210 oxides, claimed to infringe the patent.
Camras claims and places much stress on acicularity as one of the important criteria of his oxide. It should therefore be particularly noted and emphasized that he did not produce or offer in evidence a photomicrograph which would show to what extent the Camras oxide is more acicular than the oxides produced at the Easton demonstrations, if in fact such is true. Photomicrographs of the Welo and Baudisch oxides produced at the Easton demonstrations are in evidence (Dx. 1-R-5, 1-R-6). Photomicrographs of IRN-210 are also in evidence, having been offered by the plaintiff (Px. 26).
An article by J. Huggett of the University of British Columbia, published in 1929, discloses a method of precipitating Fe2O3 by reacting a solution of ferric nitrate with ammonia and then reducing the Fe2O3 in a mixture of hydrogen and water vapor. The reference teaches how to control the concentration of hydrogen and water vapor in relation to the temperature so as to obtain ferrosoferric oxide (Fe3O4), which is then oxidized to produce Fe2O3 by heating at a prescribed temperature in air (Dx. 2-A-1 and 2-A-2).
The reduction and oxidation disclosed in this article are very similar to those disclosed in the patent.
Oxides were produced at the Easton Inter-Partes demonstrations by following the Huggett teachings. These oxides showed coercive forces of Hc at 1000 in the neighborhood of 200 to 210, Bfm/Br ratio at 3 to 1 or less, rapid rise from 200 to 600 (Dx. 1-B-1, p. 12; Dx. 1-B-2, p. 5; R. 2104-2114).
By following the procedure set out in the Huggett publication, oxides having the magnetic properties claimed by Camras as his invention were obtained. The Huggett procedure however failed to produce an oxide comprised of predominantly *880 acicular particles and due to this failure it cannot be said that Huggett anticipated the patented oxides.
The defendants also refer to a German patent (Reich's Letter Patent No. 587,916) issued October 26, 1933 to Siemens and Halske (Dx. O-1 and O-2). This invention concerns a process for the manufacture of sound writing carriers for use in electromagnetic recording of sounds, such as conversation and music. The patent refers to the prior use of permanent magnetizable splinter shaped particles and claims as its invention the alignment of the splinter shaped particles on the tape.
There is no disclosure as to the type nor the magnetic properties of the material used. This publication does not anticipate the Camras oxides except possibly to show the preferred use of acicular or, as described in the patent, splinter-like particles so that orientation of the particles on the nonmagnetic carrier is possible.
The Sappa article (Dx. 1-X-1 and 1-X-2) deals with the properties of ferro magnetic substance; however, this reference is concerned with natural ores and therefore does not anticipate the patent in suit.
The Lehrer German Patent No. 675,490, issued June 12, 1936, (Dx. 1-W-1 and 1-W-2) teaches the use of magnetic oxide powders for use in producing magnetic recording media. The teachings of this patent were followed at the Inter-Partes demonstrations and oxides were produced which were found not to be acicular. When the oxide was produced it was in a solid form and had to be removed by chiseling it from the kiln. The oxide was then crushed by a jar crusher. It was then necessary to air classify the materials to obtain particles sufficiently small to coat on tape. The unclassified materials showed an Hc value of considerably less than 200 (R. 2154-2155).
On the basis of the failure to produce an oxide at the demonstrations which would conform to the patented oxides, this patent (Lehrer) does not anticipate the patent in suit.
The OSRD Report No. 5325, published June 30, 1945, (Dx. 1-B) deals, among other things, with the use of iron oxides in making magnetic recording media and describes in detail the method of preparation. The publication teaches the use of iron oxides of gamma Fe2O3 and Fe 3O4 for use as a recording media when coated on tape. It, however, does not disclose the method by which the oxides are produced and, therefore, fails to anticipate the oxides claimed by Camras as his invention.
John Herbert Orr, president of Orradio Industries, called as a witness by defendants, testified that during 1945 he was in Germany on orders of the Armed Forces and was working for the United States Government in re-establishing the German broadcasting industry; that in the course of these operations he caused to be made certain oxides and tapes which were subsequently sent to him at his home in Opelika, Alabama. These materials were received in the United States by Orr in the early part of 1946. He attempted to develop a recording disc utilizing the German oxides as a media; however, he did not succeed in developing a tape that was satisfactory.
Subsequent to the issue of the Camras patent, Orr had the German oxides tested for magnetic properties and found that the material tested at a field force of 1000 oersteds showed coercive force of Hc of 235 and Bfm/Br of 300-561, or a Bfm/Br ratio of less than 2 to 1 (R. 2550). Electron micrographs of these materials were taken and the material was found to be less than 1 micron in size and acicular in shape (Dx. 2-Y).
When the oxide was made, Orr had no knowledge of the composition of the starting material (R. 2534) and he did not know the properties of the oxide when he received it in 1946, except that it was considered a medium hard magnetie (R. 2526).
The record does not show any disclosure by Orr to othersexcept possibly to *881 members of his firm and then the information was treated as a trade secret as to the existence of the oxides or their use as a magnetic recording media. Although the Orradio Industries manufactured and sold magnetic recording tapes, the oxides obtained by Orr in Germany were not used for this purpose. Rather, oxides produced in this country were used. In 1949 Orradio tapes were made of low coercive force oxides, and in 1950 Williams IRN-110 oxides were utilized in producing the Orradio tapes (R. 2611-2615). In view of the manner in which the oxides were used and in view of the fact that there was no disclosure in this country, the oxides obtained by Orr cannot be considered as known, or for public use, such as would anticipate the Camras patent.
As early as December 1941, the George S. Mepham Corp. had produced synthetic oxides (R. 1593-1598, 1685). (They were not at that time produced for use in making magnetic recording media, but were produced for another use). These oxides were numbered MTR-1 and MTR-12 (R. 1685), were subsequently redesignated 277 and 278 respectively (R. 1637, 1691-1692) and also M3759 and M3761 (R. 1637-1638). Early in 1942, following their production in 1941, they were forwarded to the Magnaflux Corporation (R. 1603) who were testing metals for flaws by a technique involving the use of magnetic iron oxides. The Magnaflux Corporation tested the materials and found they were highly magnetic and were very suitable for their purpose; however, they rejected these oxides for their use for the reason that other less expensive oxides could be utilized satisfactorily. (R. 1699-1700) (Dx. 1-T-8-10, Dx. 1-L-(4)).
Although Magnaflux Corporation, because of the cost thereof, refused these particular oxides, the Mepham Corporation retained them and the method of their preparation, should future requirements for such oxides appear.
In 1947 Brush Development Company (hereinafter referred to as Brush) requested oxides from defendant Williams for use in making magnetic recording tapes (R. 1548-1549, 1555-1557). In response to this request Williams forwarded these two oxides together with others to Brush for use as recording media. Brush tested the oxides for their coercive force and found the Hc value of MTR-1 to be 300 oersteds and MTR-12 to have an Hc value of 235 oersteds (R. 1685-1686).
Subsequent tests conducted in 1955 disclosed that the M3759, or 277, or MT R-1, had an Hc of 330 oersteds at a field of 1000 oersteds, Bfm/Br ratio of less than 2 to 1, a rapid rise from 300 to 400 oersteds (R. 1638-1641), and that the M3761, or 278, or MTR-12, had a coercive force Hc of 240 oersteds at a field of 1000 oersteds, a Bfm/Br of less than 3 to 1, and a rapid rise between 300 and 400 oersteds (R. 1642). The particle size of both materials was found to be less than 1 micron in maximum dimension and to be of acicular shape (R. 1647-1649) (Dx. 1-N-1, 1-N-2). Brush requested oxides of high coercive force in commercial quantities and Mepham Corporation, now a part of defendant Williams, went into production to fulfill the request. Dr. Rodrian testified that the forerunners to these oxides were first made by Mepham in December 1941, and that these oxides were produced by following the prior procedures wherein he had produced 277 and 278. He further testified that the 277 and 278 oxides were produced by following the teachings of the prior art in the oxide field.
The plaintiffs claim that the procedures followed by defendant Williams in its manufacture of the IRN-100 and IRN-110 follow the patented process, that this process was disclosed to the defendant Williams by National-Standard, licensee of Armour, which company, as a licensee, had inspected the patent methods and disclosed these methods to Williams for the purpose of having oxides made to conform to the patented oxide. Dr. Rodrian, in charge of the defendant Williams' Metallurgical and Electronics Sections, testified that he had read the disclosures received from *882 the National-Standard Company, but at the time of these disclosures he was already working on the oxides for the Brush Development Company in accordance with his previous work in producing oxides 277 and 278 and that the Armour method disclosed to him by National-Standard meant nothing, since they had been previously making the high coercive force oxides for Brush (R. 1682).
Dr. Rodrian's testimony was straightforward, positive and had all the earmarks of stability.
Defendant Williams and its predecessor Mepham Corporation in 1941 produced oxides identical in all respects to the patented oxides and offered them for sale in 1942, retained samples and the method of preparing the oxides, and when high coercive force oxides were requested readily produced themthis long before any disclosure of the Camras method.
The activities of Mepham constitute prior public knowledge and use, as well as an offer of sale of oxides having the same criteria as claimed by Camras as his invention.
In April, 1946, Minnesota disclosed to Armour a magnetic oxide tape with which it had been working and asked Armour if it was interested in the use of magnetic tape for recording. Armour advised Minnesota that it had experimented with tapes using oxides having a considerably higher coercive force than that shown to Armour by Minnesota, and a sample of Armour's tape was given to Minnesota. Minnesota caused tests to be made of the oxide, as coated on the tape, to determine its magnetic properties (R. 2732). Thereafter, Minnesota requested, and Armour furnished, ten pounds of the oxides to Minnesota for its use in coating tape (R. 2733, 2737, 2738). This ten pounds of material was received by Minnesota from Armour prior to July 12, 1946, (R. 2739, 2740) and was utilized in coating tapes. Upon completion Minnesota sent one or two reels to Armour and retained the balance. The oxides furnished by Armour to Minnesota were the same oxides later patented by Camras.
Plaintiffs contend that this use of the oxides and tapes was for purely experimental purposes and that the oxides were forwarded to Minnesota with the understanding that the products would be retained in secrecy. This allegation, however, is not borne out by the record. Camras testified that these materials were forwarded to Minnesota for testing to see if they would like to go into the manufacture of such tapes (R. 378). Nowhere in the record does it appear that these oxides were forwarded to Minnesota under any cloak of secrecy. It was a disclosure of the oxides and their uses.
Not only were such oxides sent to Minnesota but portions of the oxides were also forwarded to DuPont Company on June 20, 1946. Plaintiffs do not contend there was an agreement of secrecy existing between Armour and DuPont but state there is no showing in the record that these materials were ever received by DuPont and thus there is a failure to show public use.
Paragraph (b), Section 102, Title 35 U. S. Code, provides that the right to a patent is lost where the product was in public use or on sale in this country more than one year prior to the date of the application for patent. The term "public use" was defined by the United States Supreme Court in Egbert v. Lippmann, 104 U.S. 333, 26 L.Ed. 755, wherein a patent for an invention concerning corset stays was denied for the reason that the inventor had permitted his fiancee to wear the patented corset stays more than the permitted period before applying for a patent. The court held: "We remark, secondly, that, whether the use of an invention is public or private does not necessarily depend upon the number of persons to whom its use is known. If an inventor, having made his device, gives or sells it to another, to be used by the donee or vendee, without limitation or restriction, or injunction *883 of secrecy, and it is so used, such use is public * * *"
The patented oxides and their use as a magnetic tape recording media were in public use more than one year prior to the application for patent.
Patentability of invention must be determined in accordance with the patent laws of the United States, Title 35 United States Code.
"§ 101. Inventions patentable
"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.
"§ 102. Conditions for patentability; novelty and loss of right to patent
"A person shall be entitled to a patent unless
"(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
"(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or
"(c) he has abandoned the invention, or
"(d) the invention was first patented or caused to be patented by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application filed more than twelve months before the filing of the application in the United States, or
"(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or
"(f) he did not himself invent the subject matter sought to be patented, or
"(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.
"§ 103. Conditions for patentability; non-obvious subject matter
"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."
It is axiomatic that a patent from the fact of issuance is presumed to be valid. University of Illinois Foundation v. Block Drug Co., 7 Cir., 1957, 241 F.2d 6.
In all patent cases the Court must start with the presumption of validity which attaches to the grant. This presumption is a positive factor which must be overcome by clear and convincing evidence by one who asserts invalidity. Consolidated Electrodynamics Corp. v. Midwestern Instruments, 10 Cir., 1958, 260 F.2d 811; Artmoore Co. v. Dayless Mfg. Co., 7 Cir., 1953, 208 F.2d 1; Holtensson v. Webcor, Inc., D.C.N.D.Ill.E.D. *884 1957, 150 F.Supp. 441. But where there is a strong indication that the prior art was not before the Patent Office at the time it passed on the patent in issue, the presumption of validity of the patent does not prevail as against such evidence of prior art not considered by the Patent Office. Hobbs v. Wisconsin Power & Light Co., 7 Cir., 1957, 250 F.2d 100. Upon a showing of failure of the Patent Examiner to consider the prior art the presumption of validity of the patent is greatly weakened. Johnson Laboratories, Inc. v. Meissner Mfg. Co., 7 Cir., 1938, 98 F.2d 937.
In the consolidated cases currently before the Court the defendants have sustained the burden thrust upon them by the issuance of the patent. They have shown by substantial evidence the existence of prior publications, both foreign and domestic, which, when followed, result in the production of oxides conforming in all respects to the oxide Camras asserts in his invention.
Plaintiffs assert that the prior art oxides do not anticipate the patent in suit since the measurements of size, particle shape and magnetic qualities shown in the Camras patent are not disclosed in any of the prior art. Yet, be that as it may, the Kraeber and Luyken and Williams and Thewlis publications, as well as the Bureau of Mines Bulletin, clearly disclose methods whereby high coercive force oxides may be produced from a synthetic starting material. The defendants, by following these publications, were able to produce oxides identical in all respects to Camras' claimed invention, meeting exactly the measurements prescribed by Camras as the important criteria of his material.
The Johnson British patent teaches the use of oxides Fe2O3 and Fe3O4 in producing a magnetic recording media and further teaches that the preparation of these oxides is disclosed per se in the magnetic oxide art.
The OSRD Report No. 5325 shows the use of the iron oxides gamma Fe2O3 and Fe3O4 for use as recording media and further describes the method of preparing magnetic recording tapes using the above oxides as the magnetic element.
Where there has been use of an article or where the method of its manufacture is known, there must be more than a new advantage of the product discovered in order to sustain a claim of invention. General Electric Co. v. Jewel Incandescent Lamp Co., 1945, 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43. Merely carrying forward a known principle or change in form, size, proportion or degree, or doing the same thing in the same way by substantially the same means, with better results, is not of itself invention. Mead Johnson & Co. v. Hillman's Inc., 7 Cir., 1943, 135 F.2d 955, "The mere aggregation of a number of old parts or elements which, in the aggregation, perform no new or different function or operation than that theretofore performed or produced by them, is not patentable invention." Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 130, 95 L.Ed. 162. In the Application of Hack, 1957, 44 C.C.P.A. Patents 954, 245 F.2d 246, 248, applicant sought to obtain a patent for an alloy not theretofore used for brazing purposes. It was contended that one could not justifiably rely upon previously issued patents relating to jewelry and spectacle manufacturing, for these were not analogous to the brazing art, and one could not assume the equivalency of the alloy in the environment of the applicant's claimed invention in the brazing art. The Court there said: "(A) patent on an old product, based on its new use, has never been authorized by the patent laws which provided for patents only on a new and useful art, machine, manufacture, or composition of matter, or any new and useful improvement thereof."
Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained *885 when their effect is to subtract from former resources freely available to skilled artisans. A patent on a combination which only unites old elements with no change in their respective functions withdraws that which is already known into the field of its monopoly and diminishes the resources available to skillful men. Indiscriminate creation of exclusive privileges tends to obstruct rather than to stimulate invention. "It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the art. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith." Atlantic Works v. Brady, 107 U.S. 192, 2 S.Ct. 225, 231, 238, 27 L.Ed. 438; Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162.
While an invention should not be denied patentability merely because it comes after experimentation, yet the experiment which succeeds must require some ingenuity, if it is worthy of being granted a patent monopoly. Merely to run down every obvious alley until the best route to the desired goal is found cannot be deemed invention. Johnson Laboratories, Inc. v. Meissner Mfg. Co., 7 Cir., 1938, 98 F.2d 937.
The evidence when sifted and studied at length shows that such was Camras' path in obtaining his patented material. With the aid of the previous disclosures that magnetic iron oxides were very suitable for use as a magnetic recording media, it was a simple matter to then turn to the magnetic iron oxide art and travel down the alleys of the teachings until an oxide meeting the requirements for an outstanding magnetic recording media was found. This Camras did in 1946 and 1947. However, the methods of preparing oxides having the Camras criteria and their actual preparation had been accomplished by Dr. Rodrian as early as 1941, and when called upon to furnish an oxide to meet the new demand he readily, without any knowledge of the Camras criteria, produced the exact oxides that Camras claims as his invention.
The defendants produced an abundance of evidence to show that their accused oxides were derived from a knowledge of the prior art, completely independent of the teachings of the patent in suit.
The plaintiffs charge that no single publication relied upon by the defendants anticipates the Camras patent.
It is unnecessary to go so far as to say that there is complete anticipation in any single prior art of everything Camras accomplished. The sum total of the relevant prior art disclosures is such that a person skilled in the art might readily provide the subject matter of the Camras patent. "While no single reference discloses all the admittedly old steps of the claimed method, it is proper to combine references, if warranted, to show that the bringing together of these old steps was reasonably suggested by the prior art, and would have readily occurred to the worker skilled in such art." Borkland v. Pedersen, 7 Cir., 1957, 244 F.2d 501, 502.
The characteristics of magnetic iron oxides were so well known from the prior art that its use suggested itself as soon as a need thereof was demanded by the trade.
The first great demand for high coercive force oxides arose with the advent of the Camras patent for an apparatus for magnetic recording, also sometimes referred to as a magnetic recording head (Patent No. 2,528,261 in Dx. N), which was designed to use a recording media having permeability of less than 50 and a coercive force of over 100 oersteds, preferably over 250 oersteds.
*886 As soon as the need for the high coercive force oxide was demonstrated, the trade immediately consulted the prior art and, by following the teachings there found, produced the oxides required. Particularly, Mepham and/or Williams by following the prior art produced oxides meeting the exacting requirements created by the new demand.
The Camras "patent" was not a finding that the world did not already know; it was merely a daily progression in the already known art. It cannot be recognized as an advance such as would warrant a monopoly under the patent laws.
In view of the evidence of the prior art presented during the trial, combining the references contained in the prior art is warranted and under the facts of this case the prior art as a whole should be considered.
Pointing to the commercial success of the patented oxides, the plaintiffs contend that the public acclaim accorded these oxides shows that a new and novel oxide had been produced which fulfilled the exacting demands of the public in its need of such an oxide for a modern recording media. Commercial success without invention will not make patentability. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 146, 71 S.Ct. 127, 95 L.Ed. 162. Where a combination, even though employing elements which are old, has supplied a new and functional result, the evidence of commercial success is not to be ignored in determining the ultimate question of patentable invention. The Court acknowledges the very great commercial success of the oxide and its use as a recording media, but as was stated in General Foods Corp. v. Triangle Manufacturing Co., 7 Cir., 1958, 253 F.2d 227, 230:
"The Supreme Court has stated that the factor of marked commercial success is `entitled to weight in determining whether the improvement amounted to invention and should, in a close case, tip the scales in favor of patentability.'"
However, as stated above, commercial success without invention will not make patentability. Consolidated Electrodynamics Corp. v. Midwestern Instruments, 10 Cir., 1958, 260 F.2d 811. Such is the situation presented to the Court here.
The plaintiffs assert that the royalty payments made by Minnesota to Armour, now close to a million dollars, speak emphatically for the validity of the patent; that had there been any doubt as to the validity of the patent, certainly such royalties would not have been paid.
Other companies were approached in an attempt to obtain royalties through issuances of sub-licenses by Minnesota, which it had the power to do under its exclusive licensing agreement with Armour. Without exception these offers were declined. The companies concerned, apparently deciding that rather than become licensees and thus preclude themselves from contesting the validity of the patent, chose to ignore the patent.
Payment of royalties is an important factor to consider in determining the validity of a patent, but when, as here, a patent is stillborn the payment of royalties will not bring it to life.
For the reasons herein stated the Court finds that U. S. Patent No. 2,694,656, issued to Marvin Camras, is invalid. An invalid patent cannot be infringed. Hyster Co. v. Hunt Foods, Inc., 7 Cir., 1959, 263 F.2d 130. New Products Corp. v. Outboard, Marine & Mfg. Co., 7 Cir., 1959, 263 F.2d 521. The patent is therefore not infringed by the defendants.
The defendants assert as an additional defense that the patent was procured through misrepresentation of material facts and that fraud was perpetrated on the Patent Examiner by the patentee. The Court has examined the record carefully and minutely with the purpose in mind of deciding whether or not fraud was in fact perpetrated on the Patent Examiner during the course of the long proceedings ere the patent finally issued.
*887 After having heard the testimony, reviewing the record and the exhibits, Camras either was not, at the time of the application, the expert on the preparation of iron oxides that he wanted the Patent Office to believe, or he did in fact materially misrepresent the prior art in the oxide field, for it appears that the prior art in this field showed methods by which high coercive force values could be obtained in both natural and synthetic oxides by starting with either gamma or alpha iron oxides. Although representations were made to the Patent Examiner by Camras which in the light of the evidence presented to the Court were and are incorrect, the Court cannot say that Camras perpetrated a fraud on the Patent Office or that he was guilty of wilful misrepresentation of material facts.
There was no misrepresentation of material facts or fraud by the patentee such as would permit this Court to set aside the patent on those grounds.
The defendants also allege misuse of the patent by the plaintiffs in violation of the Anti-Trust Laws. Defendant Williams counterclaims for damages on the basis of such alleged patent misuse and violation of the Anti-Trust Laws.
The Court has examined the record and all other evidence presented during the course of the extended trial, concerning the alleged violation of the Anti-Trust Laws of the United States by and between the plaintiffs, and determines that the charges of Anti-Trust violation have not been substantiated. However, the fisherman was at the water's edge, had made his cast, but no fish took the bait.
The patent is not unenforceable by virtue of any Anti-Trust violation. Judgment should be entered for the plaintiffs on defendant Williams' counterclaims.
To avoid needless repetition the foregoing and adding thereto the following shall be considered findings of fact and conclusions of law.

Additional Findings of Fact
(1) Plaintiff Armour is a corporation organized and existing as a not-for-profit research organization under the laws of the State of Illinois and has its principal place of business at Chicago.
(2) Plaintiff Minnesota is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at St. Paul, Minnesota, and licensed to do business in the State of Illinois.
(3) Williams, defendant in Civil Action No. 3200, is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at East St. Louis, Illinois, within the Eastern District of Illinois. In 1948 Williams became the successor to a business previously carried on for many years within this district by Mepham, a corporation in which Williams owned a majority of the capital stock.
(4) Technical Tape, defendant in Civil Action No. 3438, is a corporation organized and existing under the laws of the State of New York and having a place of business at Morris Heights, New York.
(5) Civil Action No. 3200 was instituted by Armour on May 27, 1955, charging infringement by Williams of United States Patent No. 2,694,656, issued to Marvin Camras on November 16, 1954, on his application filed July 25, 1947. The patent was subsequently assigned to plaintiff Armour.
(6) Defendant Williams filed its answer denying infringement, alleging invalidity and unenforceability of the patent for the reason that it has been and is being misused by the plaintiffs, presented a counterclaim for judgment declaring the patent invalid, unenforceable and not infringed, and further counterclaimed for an injunction, treble damages and other relief for alleged misuse of the patent and violation of the Anti-Trust Laws by the plaintiffs.
(7) On order of this Court Minnesota was brought in as an additional party plaintiff and required to plead to the counterclaim in Civil Action No. 3200.
*888 (8) Civil Action No. 3438 was instituted on January 21, 1956, by Armour against Technical Tape for alleged infringement of the same patent.
(9) On April 13, 1956, a suit was instituted in the United States District Court for the Middle District of Alabama by Armour against Orradio Industries, Inc., an Alabama corporation, for alleged infringement of the same patent.
(10) Armour's several suits were brought and have been prosecuted at the request and expense of Minnesota.
(11) Civil Actions Nos. 3200 and 3438 were consolidated for trial by order of this Court and a restraining order was issued enjoining the plaintiffs from instituting further suits against customers of Williams and from prosecuting the suit against Orradio Industries, Inc., pending the determination of the issues in Civil Action No. 3200.
(12) Williams filed an amended second counterclaim in Civil Action No. 3200 with respect to the patent misuse and anti-trust issues and subsequently filed amendments to the amended second counterclaim.
(13) The consolidated actions were tried before this Court from May 12, 1958 through June 4, 1958. Final arguments were heard December 8, 1958.
(14) At the trial plaintiffs stated that they rely upon claims 3, 8, 10, 14, 25 and 26. Williams is charged with the violation of claims 3, 8, 10, 14, 25 and contributory infringement of claim 26.
(15) Technical Tape is charged with infringement of claims 3, 25 and 26.
(16) There is practically an inseparable tie between the recording machine and the media to be used therewith. A magnetic recorder is not complete nor operative to give its intended performance until the mechanism is supplied with media having the same form and magnetic characteristics of the media it was designed to use. The machine is tailored to use a recording media having particular characteristics. The media are manufactured to provide those characteristics.
(17) Prior to the end of World War II magnetic recording work in the United States had been concentrated upon the development and use of wire recorders. In 1945 and 1946 wire recorders previously adapted for military uses were being adapted for production for civilian use. These recorders were designed to operate at low speeds with the use of stainless steel wire having a coercive force Hc of 250. This wire was manufactured to serve as a basic recording media for use with Armour recording equipment.
(18) In 1945 there were publications in this country describing the successful wartime development in Germany of magnetic tape recorders. Some of these recorders were brought to this country by men returning from the services in the American Armed Forces. These recorders utilized high frequency bias similar to the American wire recorders but employed as their recording media flexible plastic tapes coated or impregnated with finely divided magnetic iron oxide. They had been used successfully in Germany for radio broadcasting and other professional work requiring a high performance quality and for military field use.
(19) Discovery of the German success with tape recording was the starting point of magnetic recording in the United States.
(20) In 1945 the National Defense Research Committee issued OSRD Report No. 5325 describing a limited investigation of new magnetic recording media that had been carried on for the United States Government by the Brush Development Company. This report set forth principles of the magnetic sound recording process and taught the use of iron oxides gamma Fe2O3 and Fe3O4 for use as a recording media.
(21) In the early part of 1946 Brush introduced the first commercial home tape recorder, the Brush "Soundmirror", to the American market. This was a low cost machine using a paper tape coated with low cost black magnetic iron oxide of very small and uniform particle size. *889 It operated at a tape speed of 7½ inches per second. This became the standard speed of American tape recorders.
(22) Indiana Steel Products Company developed a tape recorder designed to use a special powder coated tape of high coercive force called "Hyflux" tape for high frequency response at a low record speed. This machine using the Hyflux tape was not commercially successful.
(23) In September, 1945, Indiana brought this recorder to Armour seeking assistance in its adaptation to commercial use.
(24) Camras, for Armour, studied and tested the Indiana recorder and knew that the coercive force value of the tape was over 250 oersteds and that the material used in coating the tape was less than 1 micron in particle size.
(25) In early 1946 Dr. H. A. Leedy, now the director of Armour, attended a demonstration of the Brush tape recorder in New York. He was very favorably impressed by its performance. Noting possible advantages of the tape recorder over the wire recorder, he suggested that Armour go into the development of tape recording and further found "the tape recorder can use the same basic ideas as are now employed in our wire recorder".
(26) Camras began work to find a magnetic iron oxide of high coercive force to match the Indiana tape coercive force values and to conform to Armour recording standards.
(27) Camras produced such oxides by the gaseous reduction of ordinary commercial iron oxide powders to the known black magnetic form of ferrosoferric oxide, Fe3O4. His starting materials were ordinary powders of red iron oxide and yellow iron oxide. The method and conditions he used for reduction are identical to those described in the United States Bureau of Mines Bulletin No. 425, as being effective to produce Fe3O4 having high coercive force and high remanence qualities characteristic of excellent permanent magnetic materials.
(28) The black magnetic oxides which resulted became the subject matter of the patent in suit and possessed all the characteristics later represented in the claims as being distinctive properties of magnetic materials invented by Camras. Those made from the yellow oxide and some from the red oxide were acicular in particle form. The method of production was the same production method used by Camras and later described and claimed in the patent as Camras' invention.
(29) Camras obtained specified starting materials which were commercially available, put them into an oven and reduced them as the literature specified. He then tested, by Armour's way of testing, and found that they possessed the properties he later claimed to be his invention.
(30) In 1946 Camras delivered samples of the acicular black oxides to Minnesota, at the request of Minnesota's salesman, for testing, to see if they would like to go into the manufacture of such tapes. In April of that year Minnesota asked for as large a quantity of the materials as it could get. Armour built a kiln to make larger batches. In June deliveries were made to Minnesota and also to the DuPont Company. In July ten pounds were delivered to Minnesota, at its request, for use in making a small production run of recording tape. These oxides were used by Minnesota to manufacture coated magnetic record film.
(31) More than one year prior to the filing of the application of the patent in suit Armour delivered and Minnesota used for its own commercial purpose the ferrosoferric oxide, later claimed in the Camras patent, including the manufacture of magnetic recording tape coated with the oxide.
(32) At the time of the deliveries and uses there were no restrictions on Minnesota's freedom to use, disclose to others, or otherwise dispose of the products; therefore, when Camras delivered the oxides to Minnesota they passed beyond his control.
(33) Before making the deliveries referred to in findings Nos. 31 and 32 *890 Camras filed an application claiming as his invention particular ways of making magnetic iron oxides having high coercive force and remanence qualities from hematite powders and other material. This patent application was abandoned after all claims had been finally disallowed by the Patent Office.
(34) On June 1, 1946, Camras filed a patent application (which issued in 1950 as United States Patent No. 2,528,261) claiming as his invention the combination of the conventional ring type recording head of sound recorders with any recording media, whether in the form of a wire or a tape having a coercive force of over 100 oersteds, preferably 250 oersteds and a residual permeability below 50.
(35) By August, 1946, Dr. Wetzel of Minnesota was brought into the magnetic tape work and given samples of Armour oxide. In September he asked Howell K. Smith, Minnesota's chemist, to produce oxides of high coercive force. Smith promptly did so by going to the literature and following processes found therein. Smith made the black oxides and the gamma ferric oxide later claimed by Camras.
(36) Smith did not believe that he had made any discovery or done anything new in making the oxides.
(37) The specification of the Camras patent describes its invention as relating to permanent magnet material and to a method of making same.
(38) It shows the intention of using the material for the manufacture of magnetic recording media.
(39) The method described and claimed in the patent consists essentially in making the ordinary ferric oxide Fe2O3 or alpha ferric oxide monohydrate Fe2O3.H2O in a fine powder form which is synthetic non-magnetic; reducing the material at an elevated temperature to magnetic Fe3O4 having a high coercive force, and if desired, then oxidizing the Fe3O4 at an elevated temperature to obtain magnetic gamma ferric oxide Fe2O3 also having a high coercive force.
(40) The characterizations of the Camras material do not identify or distinguish any new form or structure of magnetic iron oxide.
(41) Defendants introduced evidence of prior publications, prior patents, prior knowledge and use which established that there is nothing new or inventive in the subject matter of the Camras patent.
(42) The United States Bureau of Mines Bulletin No. 425 (1941) discloses the production of high coercive force Fe3O4 by the gaseous reduction of ordinary Fe2O3 or Fe2O3.H2O and the production of gamma ferric oxide having similar magnetic properties by oxidation of the Fe3O4. The bulletin teaches the conditions of reduction and oxidation effective to produce high coercive force magnetic iron oxides, including all the conditions set forth and claimed in the Camras patent. It deals with powders of pure minerals, both natural and artificial. It shows coercive force values of 150 to 425 oersteds can be obtained by the gaseous reduction process and that a reduction temperature of 400°C. is conducive to an optimum combination of high coercive force. The reduction temperature is identical to the 752°F. stressed by Camras.
(43) Magnetic oxides having magnetic properties identical to those of the Camras method and oxide claims may be produced by following the methods of the disclosure.
(44) The Kraeber and Luyken publication (published in 1936) disclosed methods of making magnetic iron oxides which consist in taking commercial synthetic non-magnetic Fe2O3.H2O in a fine powder form, reducing that material with carbon monoxide at 400°C. for one-half hour to produce a ferrosoferric oxide Fe3O4, and oxidizing the ferrosoferric oxide to gamma ferric oxide by heating it in air at 200°C. for one hour. The methods are identical to methods described in the Camras patent and produce oxides identical in substance to the materials claimed in the Camras patent.
*891 (45) The Williams and Thewlis publication (published in 1931) disclosed the method of making gamma ferric oxide by the dehydration of artificial gamma ferric oxide monohydrate Fe2O3.H2O at 350°C. for two hours. That method produces acicular gamma ferric oxide identical in substance to the gamma ferric oxide claims of the Camras patent.
(46) The Johnson British patent of 1937 disclosed the use of synthetic gamma ferric oxide, in the 1 micron range, of high coercive force, for use as the magnetic material of magnetic sound recording tape.
(47) Mepham and its Metallurgist Dr. Rodrian produced artificial magnetite (ferrosoferric oxide Fe3O4) in December of 1941 by reducing ordinary yellow iron oxide (alpha monohydrate Fe2O3.H2O) of about 1 micron particle size and acicular particle form, with hydrogen and steam. The magnetite made in 1941 was of a variety of magnetic iron oxide powders produced for use as sales samples to generate new demands and uses for products available from Mepham's hydrogen reduction furnace. It was tested by Rodrian and known to be strongly magnetic.
(48) A portion of that magnetite was oxidized by Dr. Rodrian to the form of magnetic gamma ferric oxide by heating it with exposure to air.
(49) In early 1942 Mepham offered to sell to Magnaflux Corporation of Chicago, Illinois the magnetite made from yellow oxide and the gamma oxide made from that magnetite. Sales samples of these oxides, designated 277 and 278, were delivered to Magnaflux and prices were quoted for production and deliveries of the material in large quantities.
(50) Upon the introduction of Mepham to magnetic tape requirements in October, 1947, Mepham delivered to Brush samples of the 1941 magnetite (Nos. 277 and 278). These samples were supplied for use in Brush's magnetic tape work. Brush tested these oxides and found that they possessed high coercive force and high remanence properties.
(51) The Nos. 277 and 278 oxides as offered for sale to Magnaflux in 1942 were respectively ferrosoferric oxide and gamma ferric oxide powders identical to the magnetic oxides claimed by Camras as his invention.
(52) The methods for the production of these oxides, as known to and used by Mepham and Dr. Rodrian, were made known to Magnaflux in 1942 and were identical to the subject matter of the Camras patent.
(53) The Mepham magnetite made in 1941 from yellow oxide and the gamma oxide made from that magnetite were the beginning of Williams' now accused business in its magnetic iron oxides. Mepham's submissions of MTR-1 and MTR-12 to Brush in October, 1947, were followed directly by the production and delivery by Mepham of numerous lots of high coercive force ferrosoferric oxide of the same character as the 1941 magnetite and were for use in Brush's work with magnetic tapes.
(54) Mepham and Williams acquired no new knowledge of magnetic iron oxides, or their production, through the meeting in September, 1948, with National Standard Company.
(55) The Patent Office did not have before it, or did not cite in its consideration of the application for the Camras patent, the most pertinent parts of the United States Bureau of Mines Bulletin, the Kraeber and Luyken publication, the Williams and Thewlis publication, knowledge of the Mepham oxides Nos. 277 and 278, or knowledge that the Camras oxides had been furnished to Minnesota and DuPont more than one year before the filing of the application.
(56) For lack of the evidence shown in finding No. 55 the Patent Office did not know that synthetic magnetic iron oxides, acicular in form and in the 1 micron size range, showing coercive force values over 200 oersteds, existed in, and could readily be produced by, methods disclosed in the prior art.
(57) The recognition in the magnetic recording art before 1946 of the usefulness *892 of magnetic powders of high coercive force, including high coercive force magnetic iron oxides in coated magnetic recording media and the known usefulness for such media of magnetic powders, including synthetic iron oxide powders of acicular particle form, show that no invention was involved in using high coercive force magnetic iron oxides of the character claimed in the Camras patent as an element of magnetic impulse recording media.
(58) The Camras patent disclosed nothing more, with respect to the manufacture of magnetic recording media, than the substitution of one material for another material of the same class in a structure of which the elements, the purpose, the nature and the mode of use were all old.
(59) The record member claims of the patent claimed a combination which only united old elements with no change in the respective functions with the purpose of withdrawing what already was known into the field of a patent monopoly and diminishing the resources available to skilled men.
(60) There is no evidence in the record that would substantiate the charge that Camras or his attorneys wilfully made any mis-statement or misrepresentation to the Patent Office in the allowance of the Camras patent in suit.
(61) There has been no price-fixing or patent pooling or cross licensing; there has been no use of a patent or patents to control the manufacture, use or sale of unpatented articles or materials, nor any attempt to force others to buy only the patented products; there has been no joint control of any licensing program between the plaintiffs.
(62) The record does not support defendants' claim of alleged misuse of the patent in suit.
(63) The defendants have suffered no damage as the result of any alleged illegal acts of the plaintiffs in misuse of the patent in suit in violation of the Anti-Trust Laws.

Additional Conclusions of Law
(1) This Court has jurisdiction of the parties and of the subject matter.
(2) The patent in suit is entitled to the presumption of validity which attaches to the grant.
(3) This presumption of validity was overcome by the defendants' evidence.
(4) The references cited by the defendants clearly anticipate the Camras invention in such full, clear and exact terms as to enable a person skilled in the art to produce the subject matter thereof.
(5) Camras' patent No. 2,694,656 is invalid.
(6) Defendants have not infringed any right of either plaintiff.
(7) The plaintiffs have not violated the Anti-Trust Laws of the United States.
(8) The counterclaims of defendant Williams have not been sustained and will be dismissed.
(9) The defendants are entitled to a judgment dismissing the complaints, holding the Camras patent No. 2,694,656 invalid and therefore not infringed, and permanently enjoining the plaintiffs from the prosecution against the defendants' respective customers of further charges or suits for infringement of said patent.
(10) Defendants are entitled to recover their costs in accordance with applicable statutes in such case made and provided.
Parties to settle the order.